UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
COVINGTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff/Respondent, | ) | No. 2:02-CR-45-DLB-REW-1 |
| | ) | No. 2:16-CV-168-DLB-REW |
| v. | ) | |
| | ) | RECOMMENDED |
| GREGORY SULLIVAN, | ) | DISPOSITION |
| | ) | |
| Defendant/Movant. | ) | |
| | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

On September 10, 2016,[1] Defendant/Movant, Gregory Sullivan, filed a *pro se*[2]

motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255—his third such

motion. DE 356 (Motion). Between 1999 and 2002, Sullivan robbed twelve financial

institutions in Northern Kentucky. Fifteen years ago, a jury convicted him for the spree.

Multiple courts have since reviewed Sullivan's convictions. Each has affirmed or, except

as to technical sentencing relief, denied any remedy. Undeterred, Sullivan presses on. The

instant motion expansively pursues collateral relief. The voluminous claims' overarching

theme is Defendant's insistence that FBI Special Agent Doug Warner headed a broad

conspiracy to frame Sullivan for the robberies.

---

[1] The filing date reflects the prison mailbox rule. *See Richard v. Ray*, 290 F.3d 810, 812-13 (6th Cir. 2002) (*per curiam*). Here, Sullivan affirmed under penalty of perjury that he placed the § 2255 motion in the prison mailing system on September 10, 2016. DE 356-3, at 18.

[2] Pro se petitions receive a comparatively lenient construction by the Court. *Franklin v. Rose*, 765 F.2d 82, 84-85 (6th Cir. 1985) (noting that "allegations of a *pro se* habeas petition, 'though vague and conclusory, are entitled to a liberal construction'" including "active interpretation" toward encompassing an allegation stating "federal relief").

Per normal practice, the District assigned the matter to the undersigned for a recommended disposition. For the reasons explained, the Court **RECOMMENDS** that the District Judge fully **DENY** § 2255 relief (DE 356; DE 407) and issue **NO** Certificate of Appealability.

How are we here, fifteen years after the conviction? More detail follows, but the nutshell is this: Although Sullivan lost on direct appeal and mostly lost on a full § 2255 run, a limited 2015 resentencing after the habeas appeal (and the new judgment principles of *Magwood*[3] and *King*[4]) revivified the nearly dead case, giving Sullivan an avenue for further litigation. Shockingly, he eschewed a direct appeal of the new judgment and turned to § 2255 again, presenting the current matter. For a host of procedural and merits reasons, the Court rejects the effort.

## I.    BACKGROUND INFORMATION

In January 2003, a grand jury indicted Sullivan on two counts of armed bank robbery (Counts 1 & 4), two counts of firearm use during a crime of violence (Counts 2 & 5), and ten counts of bank robbery (Counts 3 & 6–14), in violation of 18 U.S.C. §§ 2113(a), (d), and 924(c)(1). DE 73 (Second Superseding Indictment). The indictment addressed a string of twelve Northern Kentucky bank and credit union robberies resulting in $107,425 in total losses.[5] After a seven-day trial, the jury convicted Sullivan on all

---

[3] *Magwood v. Patterson*, 130 S. Ct. 2788 (2010).

[4] *King v. Morgan*, 807 F.3d 154 (6th Cir. 2015).

[5] The charged robberies included: Count 1, 12/17/99, Columbia Federal Savings Bank, Florence, KY, $9,679.00; Count 3, 10/11/00, Columbia Federal Savings Bank, Florence, KY, $4,216.00; Count 4, 10/25/00, PNC Bank, Union, KY, $9,343.00; Count 6, 2/27/01, First Security Bank, Edgewood, KY, $1,949.00; Count 7, 3/14/01, Provident Bank, Cold Spring, KY, $5,209.00; Count 8, 5/11/01, C & O United Credit Union, Edgewood, KY, $ 21,430.00; Count 9, 8/31/01, PNC Bank, Taylor Mill, KY, $12,426.00; Count 10, 10/26/01, C & O United Credit Union, Edgewood, KY, $14,613.00; Count 11, 12/6/01, Park Federal Credit Union, Florence, KY, $5,275.00; Count 12, 1/25/02, PNC Bank,

counts charged. Judge Coffman entered judgment on September 22, 2003, and sentenced Sullivan to a total term of 572 months of imprisonment, followed by 5 years of supervised release. DE 180 (Judgment). Sullivan appealed. DE 183 (Notice of Appeal). The Sixth Circuit affirmed Sullivan's conviction and sentence on December 22, 2005. DE 223 (Judgment).

The Court of Appeals articulated the underlying facts and case history following the December 17, 1999, Columbia Federal Savings Bank robbery in Florence:

[I]t was the robbery of the Heritage Bank in Fort Wright, Kentucky on June 11, 2002, that first implicated Sullivan as a suspect in the robberies. According to eyewitnesses and bank surveillance video photographs, the robber entered the Heritage Bank, announced the robbery, ordered the male employees to sit on the floor, and demanded money from the female tellers. After receiving approximately $11,000, the robber ordered the tellers to the ground and fled.

Investigators collected an array of evidence linking Sullivan to the Heritage Bank robbery. First, the bank manager, Christopher Caddell, testified that he saw the robber fleeing in a 1990 to 1995 turquoise or aqua-green Chevrolet Camaro Z–28, and later identified a photograph of the blue 1995 Chevrolet Camaro Z–28 owned by Sullivan's current wife as the car used in the getaway. Second, a fingerprint left by the robber matched Sullivan's. Third, bait money taken during the robbery came back to the bank through deposits suggesting Sullivan's involvement in the robbery. Last, bank surveillance video photographs and eyewitness accounts depicted the suspect wearing a burgundy or maroon baseball hat with a gold letter "B" like that found on the uniform hat for the Bluegrass Baseball Club, which had issued Sullivan's son a uniform.

During the course of investigating the Heritage Bank robbery, detectives learned that several northern Kentucky banks and credit unions had been robbed by suspects with similar descriptions to that of the Heritage Bank robber. During interviews with eyewitnesses to these robberies, fifteen individuals identified Sullivan as the robber from a photographic array. Based upon this information, officers executed a warrant to search the blue Camaro Z–28 registered to Sullivan's wife, which uncovered caps, sunglasses, a scarf/bandana, various shirts, jackets, carpet fiber, financial

---

Edgewood, KY, $7,535.00; Count 13, 5/17/02, Firstar Bank, Fort Wright, KY, $3,932.00; Count 14, 6/11/02, Heritage Bank, Fort Wright, KY, $11,819.00.

records, and currency. Following the search, Sullivan was placed under arrest and later indicted by a federal grand jury . . . .

Sullivan, represented by appointed counsel, pled not guilty to the second superseding indictment. Counsel filed a number of pre-trial motions, including a motion to suppress the out-of-court eyewitness identifications, which the district court denied following an evidentiary hearing.

*United States v. Sullivan*, 431 F.3d 976, 978–79 (6th Cir. 2005) (hereinafter *Sullivan I*)

(footnotes omitted).

In his direct appeal Sullivan contended that:

[T]he district court erred by denying his motion to substitute counsel filed *pro se* on the fifth day of his trial.
. . . .
[T]he government failed to present sufficient evidence from which a reasonable juror could conclude that Sullivan, as opposed to someone else, committed these robberies.
. . . .
[T]he district court's denial of his motion to suppress the government's eyewitness identification evidence violated his due process rights.
. . . .
[T]he [evidence the] Government was required to disclose under *Brady* consists of discarded fiber and hair samples taken from a bandana believed to have been worn by the robber of the Heritage Bank, as well as copies of some of the suspect description forms completed by eyewitnesses shortly after the robberies.

*Sullivan I*, 431 F.3d at 979, 982, 984–85.[6] The Court of Appeals rejected each claim. *Id.*

at 982, 984–86.

During the appeal's pendency, on September 23, 2004, Sullivan filed his first §

2255 motion. DE 213 (Motion). The District Court denied the motion, without prejudice,

as premature. DE 220 (Order). Sullivan filed a chronologically second § 2255 motion on

September 24, 2007. DE 239 (Motion); DE 247 (December 10, 2007, Amended Motion).

On July 28, 2008, Magistrate Judge Wehrman found the claims meritless and

---

[6] Sullivan also raised a *Strickland* ineffective assistance claim, which the Sixth Circuit declined to address "[i]n the absence of an adequate record[.]" *Sullivan I*, 431 F.3d at 987.

recommended denial. DE 267 (Report and Recommendation). After granting Sullivan five extensions to the objection deadline (which Sullivan ultimately failed comply with), Judge Coffman adopted the report and recommendation and denied the § 2255 motion. DE 293; *see also* DE 325 (Sixth Circuit Opinion), at 5. Sullivan appealed the denial. The Sixth Circuit affirmed the judgments[7] "as to all aspects of Sullivan's conviction," but reversed and remanded for resentencing under *United States v. Booker*, 125 S. Ct. 738 (2005). *See Sullivan v. United States*, 587 F. App'x 935, 949 (6th Cir. 2014) (hereinafter *Sullivan II*). The *Sullivan II* panel thought it was writing the case requiem, noting that despite Sullivan's "never-ending litany of motions . . . at some point that must come to an end." 587 F. App'x at 937. The *Booker*-based resentencing gave Sullivan new procedural life.

Upon resentencing, DE 341 (Resentencing Minutes), Judge Bunning entered an amended judgment and again sentenced Sullivan to the same 572-months' imprisonment, followed by 5 years of supervised release. DE 343 (Amended Judgment). Of course, Sullivan had counsel for resentencing, DE 334, and the Court directly notified Defendant of his right to appeal. DE 342. Despite that, Sullivan did not appeal the new judgment. Instead, he presented a new and plenary § 2255, attacking the underlying conviction via multiple theories. Following its initial review, the Court ordered briefing to address successiveness analysis in light of *Magwood*, 130 S. Ct. 2788, and *King*, 807 F.3d 154. DE 362 (Order). The United States conceded, based on *King*, that "Sullivan may file another petition without seeking leave from the Sixth Circuit Court of Appeals." DE 363, at 1. It is *King* that creates an Escher-like feel to the case. *Sullivan I* dealt with direct-

---

[7] Some complicated procedural wrangling resulted in entry of multiple judgments. Those intricacies do not matter here.

appeal merits, affirming. *Sullivan II* dealt with a raft of § 2255 claims. *Sullivan II* rejected everything and purported to fully validate the convictions, relenting only on the isolated *Booker* issue. Despite that, the new judgment, combined with *King*'s new judgment principles, created an avenue for Sullivan potentially to revisit each aspect of the case. For reasons known only to Sullivan, he did not appeal the new judgment and instead put his full hopes in § 2255.

The Court's December 13, 2016, briefing schedule gave Sullivan 30 days to file a memorandum in support. In keeping with this case's long and tortuous procedural history, Sullivan twice received extensions, DE 366 & 368 (Orders), before filing a non-compliant 947-page memorandum. DE 369 (Memorandum in Support). The Court struck this tome, ultimately limiting Sullivan to a 40-page submission. DE 373 (Order). As a result of various motions to end-run this page limit,[8] and following two additional extensions to Defendant's submission deadline, DE 379 & 391 (as well as two rejected extension requests, DE 392 & 394), the Court deemed the portions of Sullivan's October 27, 2017, filing that did not renew previously overruled objections as the intended replacement § 2255 memorandum. *See* DE 408 (Order). Sullivan's reply, DE 420, to the Government's response, DE 412—though, unsurprisingly, not without various interim Sullivan filings[9]—closed the briefing. *See* DE 421. The motion stands ripe for review.

Sullivan, with his motion, adopts a quantity-over-quality approach. He seeks reexamination of the entire case—from the investigation inception to the jury verdict.

---

[8] *See*, *e.g.*, DE 374 (Motion to Exceed Page Limit), DE 377 (Motion for Reconsideration), DE 395 (Motion to Expand the Record), DE 406 (Renewed Motion to Expand the Record).

[9] *See* DE 413 (Defendant's Out of Time Objections); DE 415 (Motion to Amend/Correct); DE 418 (Clarification and Opposition); DE 421 (Motion to File Excess Reply Pages).

The arguments are legion; the merits absent. Sullivan attempts to bludgeon his way to relief with a host of attacks on trifles in the case periphery. But the Court, on § 2255 review, examines only for errors of constitutional or fundamental significance. Claim volume does not correlate to claim merit. *Cf. Fifth Third Mortgage Co. v. Chicago Title Insurance Co.*, 692 F.3d 507, 509 (6th Cir. 2012) ("When a party comes to us with nine grounds for reversing the district court, that usually means there are none.").

Sullivan repeatedly and vehemently insists he was framed. Yet, his filings substantiate no conspiracy. Many of the scattershot arguments consist of little more than nonsensical, unsupported theorizing.[10] None warrants relief. The Court has waded through the 50-claim barrage and finds that the enfilade misses the narrow § 2255 target. Sullivan portrays himself as the victim of a broad conspiracy, but his theories, even with expansive conjecture, address only a sliver of the abundant proof arrayed against him. Quoting again the Sixth Circuit:

> At trial, the prosecutor produced 25 eyewitnesses to describe the robber and the robberies. More importantly, 15 of those eyewitnesses—at least one for every robbery—specifically identified Sullivan as the robber. The prosecutor corroborated the testimony with independent evidence, such as surveillance video, and a shirt and ball cap recovered from Sullivan's possession that matched certain witness descriptions. The police had lifted Sullivan's fingerprint from one of the robberies and had matched the description of the getaway car to a Camaro Z–28 registered to Sullivan's wife. Another police officer testified that his encounter with Sullivan on October 11, 2000—the same day as one of the robberies—was memorable

---

[10] *See, e.g.,* DE 407-2, at 23 ("I said to Agent Warner on the way [to the initial appearance], 'Doug, there is no way you have a fingerprint of mine, for one, I'm not a Bank robber, and I've [sic] never stepped foot on Heritage Bank's parking lot, and I did not know where they had been located at.' Agent Warner said, 'Do you know Mike Wilson?' I said, 'Yes, that's my wife's ex-husband.' Agent Warner says, 'What dose Robbin [sic] look like?' Agent Warner in his own arrogance, was telling me that it was another phone call, he could not answer my question because he knew my fingerprint did not come off of the inside glass door of Heritage Bank[.]"). This exchange makes little sense except in capturing the self-serving view that Agent Warner fabricated the full case.

because Sullivan had a large amount of cash, in $20 and $50 bills. A Boone County Child Support Officer testified that, on October 25, 2000—the day of another robbery—Sullivan made a $3,000 cash payment, in $50 and $100 bills. And several witnesses linked Sullivan to "bait bills" from another robbery. Finally, two jail-house informants testified that Sullivan had boasted about his committing the robberies, describing himself as the "Bandana Bandit."

*Sullivan II*, 587 F. App'x at 937. The reality is, the jury convicted Sullivan because the Government conclusively proved he robbed 12 banks. For the following reasons, the Court recommends wholesale dismissal and certificate of appealability denial.

To assure fluency with the record, the Court has carefully reviewed the case and read the entire trial transcript. To the extent identifiable, the Court also consulted the exhibits and alleged proof Sullivan cites. Flyspecking a case this voluminous is easy enough, and like any trial and investigation, Sullivan can point to flaws and imperfections. Cosmetic irregularity does not implicate the Constitution. Sullivan's behavioral choices in 1999-2002, and his procedural choices in this litigation, have him where he is—convicted and without any additional remedies.

## II.    STANDARD OF REVIEW

Under 28 U.S.C. § 2255, a federal prisoner may obtain post-conviction relief if his sentence violates the Constitution or federal law, the federal court lacked jurisdiction to impose such sentence, or the sentence exceeds the maximum authorized by law. 28 U.S.C. § 2255(a); *Mallett v. United States*, 334 F.3d 491, 496–97 (6th Cir. 2003) ("In order to prevail upon a § 2255 motion, the movant must allege as a basis for relief: '(1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid.'" (quoting *Weinberger v. United States*, 268 F.3d 346, 351 (6th Cir. 2001))). A

defendant alleging a constitutional basis must establish "an error of constitutional magnitude" and show that the error had a "substantial and injurious effect or influence on the proceedings" in order to obtain § 2255 relief. *Watson v. United States*, 165 F.3d 486, 488 (6th Cir. 1999) (citing *Brecht v. Abrahamson*, 113 S. Ct. 1710, 1721–22 (1993)). When alleging a non-constitutional error, a defendant must prove that the error constituted a "'fundamental defect which inherently results in a complete miscarriage of justice,' or, an error so egregious that it amounts to a violation of due process." *United States v. Ferguson*, 918 F.2d 627, 630 (6th Cir. 1990) (quoting *Hill v. United States*, 82 S. Ct. 468, 471 (1968)); *see also Watson*, 165 F.3d at 488. In making a § 2255 motion, a movant generally bears the burden of proving factual assertions by a preponderance of the evidence. *McQueen v. United States*, 58 F. App'x 73, 76 (6th Cir. 2003) (*per curiam*) ("Defendants seeking to set aside their sentences pursuant to 28 U.S.C. § 2255 have the burden of sustaining their contentions by a preponderance of the evidence.").

Sullivan pursues six general theories for relief, three of which have numerous subparts. He repeats, reframes, or reformats many of the same allegations. Based on the following analysis, and under the applicable standards, every contention, on this record, decisively fails.

Sullivan offers almost no legal discussion, and he makes precious few cites to the specific evidence he intends the Court to review. The Court has endeavored to construct and analyze the claims within the § 2255 filings, and has tried its best to discern the exhibits and papers that pertain to those claims. Sullivan is the movant and has the burden of justifying relief, and his procedural lapses not only make the plowing difficult, they also undercut the validity and proper presentation of the theories for relief.

### III.    PROCEDURAL DEFAULT

As an initial matter, the Court considers procedural default. The Government presses the issue. DE 412, at 2–5. Defendant, as to the topic of default, cursorily replied. DE 420, at 1–3. "Section 2255 is not a substitute for a direct appeal, and thus a defendant cannot use it to circumvent the direct appeal process." *Regalado v. United States*, 334 F.3d 520, 528 (6th Cir. 2003). "In the case where the defendant has failed to assert his claims on direct appeal and thus has procedurally defaulted, in order to raise them in a § 2255 motion he also must show either that (1) he had good cause for his failure to raise such arguments and he would suffer prejudice if unable to proceed, or (2) he is actually innocent." *Id.* Cause sufficient to excuse default ordinarily consists of "some objective factor external to the defense" that prevented Defendant from raising the issue on direct appeal, "not . . . whether counsel erred[.]" *Murray v. Carrier*, 106 S. Ct. 2639, 2645 (1986). The procedural default doctrine only bars "claims that could have been raised on direct appeal, but were not[.]" *Ray v. United States*, 721 F.3d 758, 761 (6th Cir. 2013).

Sullivan's intervening successful *Booker* claim casts doubt on any direct application of the Sixth Circuit's past procedural default findings. *King*, 807 F.3d at 159–60 ("[R]es judicata generally does not apply to habeas challenges even when a petitioner raises the same claim after resentencing as he had in an earlier petition."). Under *King*, Sullivan must nonetheless show that he "did not procedurally default each claim[.]" *Id.* at 160.

Even if Sullivan's resentencing invalidated earlier procedural default findings, Sullivan again defaulted many of his claims. Despite notification of appeal availability (DE 342), Sullivan did not appeal the 2015 Amended Judgment (DE 343). This is

shocking because, by that point in the litigation, Sullivan was surely well-schooled on procedural default rules. The Sixth Circuit had discussed the doctrine exhaustively in *Sullivan II*. *See* 587 F. App'x at 942, 944–45. Indeed, Movant lost on several claims in that iteration because of procedural default. The new judgment gave him a new appeal, which he eschewed, again failing to present, on appeal, the claims he now attempts to press under § 2255. *See also Ajan v. United States*, 731 F.3d 629, 631–32 (6th Cir. 2013) (holding successful § 2255 movants are entitled to direct review of resulting new judgment). Having "failed to assert his claims on direct appeal[,]" Sullivan cannot use § 2255 as a substitute. *Regalado*, 334 F.3d at 528. The Court holds that Sullivan (at minimum) defaulted his prosecutorial misconduct, testimony denial, and counsel denial claims. *But see Massaro v. United States*, 123 S. Ct. 1690, 1694 (2003) ("[A]n ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal."). *Brady*-claim default presents a slightly thornier question.

Generally, a true *Brady* violation "implicitly constitutes a *per se* excuse ('cause' and 'prejudice') for procedural default in habeas review." *Apanovitch v. Houk*, 466 F.3d 460, 473–74 (6th Cir. 2006). However, the rationale underlying the general rule is inapplicable when a Defendant has the *Brady*-predicate at the time of direct appeal. Documents suppressed at trial but disclosed before appeal would not fit within a presumed cause and prejudice model because the defendant would have had the evidence (and thus the claim) to present on appeal. Aptly, the Sixth Circuit found Sullivan's *Brady* procedural default inexcusable for any claims based on documents Sullivan's appellate counsel possessed, but did not address on direct appeal. *Sullivan II*, 587 F. App'x at 944–

45 ("Consequently, Sullivan has procedurally defaulted on any *Brady* claims concerning these documents because his appellate counsel, who had these documents, did not raise these claims on direct appeal."). This represents the principle—that forgoing claims on direct appeal while having the predicate evidence for such claims effects procedural default. Further, the Circuit alerted Sullivan to the principle, and despite that, he made no direct appeal the second time around.

Even if (as Sullivan argues, DE 420, at 2) *King* prevents the Court from directly applying the Sixth Circuit's prior default ruling, the underlying rationale remains intact. Sullivan shows no good cause for his most recent default. He possessed the documents now relied upon at least as early as 2014. DE 325, at 15 ("Sullivan's current counsel has urged us to supplement the record and admit hundreds of pages of alleged *Brady* material[.]"). Sullivan repeatedly references the FOIA and ORA documents he secured and tried to present in the prior § 2255 process. *See* DE 407-2, at 18 (referencing receipt of 792 pages of FBI documents); *id.* at 18–19 (discussing effort to supplement first § 2255); *id.* (promising to "re-submit[] his Motion to Expand the Record with attachments. These materials are highly exculpatory and impeaching"). If Sullivan had the key evidence at the time of his last § 2255 appeal, then he perforce had the evidence at the time of his second direct appeal opportunity.[11] Sullivan reports receiving new documentation no later than November 19, 2012. DE 420, at 2. Any suppression of

---

[11] The Court has reviewed Sullivan's efforts to supplement the record on his prior § 2255 appeal and finds that on or before February 13, 2012, Movant possessed: (1) the "Bait Bill" related evidence logs, (2) the Heritage Bank night deposit log, (3) the BCSO line-up shown to Mary Ann Vowels, and (4) the narrative report regarding Vowels's 2000 near-identification. *Sullivan II*, Case No. 11-5138, ECF No. 56-2, at 64, 67 & ECF No. 56-5, at 46, 55. Sullivan's appendix index makes clear how broad the disclosures were prior to Movant's second direct appeal. *See generally id.* at ECF No. 56-6. Plainly, Sullivan stakes his current arguments on the fruit of FOIA requests, and Movant held those records during the § 2255 appeal.

evidence at trial would not have caused Sullivan to default claims during the second direct appeal.

Sullivan's failure to raise the related *Brady* claim swath, post resentencing, on direct appeal cannot be excused. *See, e.g.*, *Smith v. Murray*, 106 S. Ct. 2661, 2667–68 (1986) (holding that the "cause" inquiry probes "whether at the time of the default the claim was available at all" (internal quotation marks removed)); *Albrecht v. Horn*, 485 F.3d 103, 130 (3d Cir. 2007) (holding that Albrecht did not "show cause" for his failure to raise a Brady claim "because these statements were available at the time of his direct appeal"); *Finley v. Johnson*, 243 F.3d 215, n.4 (5th Cir. 2001) (noting that Finley did not "advance the theory that he did not raise this [Brady] issue on direct appeal . . . because the existence of the undisclosed evidence was not known . . . at the time that he could have appealed" and therefore "has failed to show cause for his procedural default"); *Scott v. Mullin*, 303 F.3d 1222, 1228 (10th Cir. 2002) (implying that default would apply if Scott had been "aware of the existence of the [pertinent] evidence at the time of his direct appeal"). The Court holds that Sullivan procedurally defaulted, without excuse or exception, his *Brady* claims.[12]

---

[12] As an alternative to showing cause and prejudice, a movant may also raise a procedurally defaulted claim on § 2255 if he can demonstrate "he is actually innocent." *Regalado*, 334 F.3d at 528. Again, Sullivan relies entirely on *King*/*Magwood* (and only as to his *Brady* claims) to excuse his default. He makes references to "innocence" but does not explore the parameters of the "actual innocence" excuse for default. *Bousley v. United States*, 118 S. Ct. 1604, 1611 (1998) ("To establish actual innocence, petitioner must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." (internal quotation marks omitted)). As with the earlier § 2255 trip, "while Sullivan . . . make[s] allusions to 'actual innocence,' there is no such showing here." *Sullivan II*, 587 F. App'x at 937. Sullivan, on this record, makes no genuine approach to the demanding actual innocence standard.

Nonetheless, in the interest of completeness, the Court will examine and address the merits of each claim. The *Brady* arguments mostly have a correlated ineffective assistance claim (thus fairly necessitating merits review), and generally due to theory interrelatedness, the Court also relies on the subsequent merits analysis to recommend dismissal regarding each assertion.

## IV.    *BRADY* CLAIMS

Nearly fifteen years ago, Sullivan, in his direct appeal, argued that the prosecution violated *Brady v. Maryland*, 83 S. Ct. 1194 (1963), by suppressing certain physical evidence, "as well as copies of some of the suspect description forms completed by eyewitnesses shortly after the robberies." *Sullivan I*, 431 F.3d at 985. The Court of Appeals rejected the claims:

> Sullivan has failed to make out a *Brady* violation with respect to the fiber and hair samples. Sullivan has not demonstrated that the samples were favorable to his defense. . . . Even assuming that the samples would have been favorable to Sullivan's defense, he has failed to demonstrate that he was prejudiced by their absence.
> . . . .
> Likewise, Sullivan has failed to make out a *Brady* violation with respect to the eyewitness identification forms because he has presented no evidence from which we could conclude that information in the missing forms would be favorable to his defense. Sullivan fails to identify which of the twenty-eight eyewitnesses' description forms are missing, nor does he describe how the information contained in the forms could have been exculpatory.

*Id.* at 986.

Sullivan also alleged *Brady* violations in his prior, appealed § 2255 motion:

> Sullivan's counsel points to numerous documents allegedly withheld in violation of *Brady*, specifically concerning: the results of a photo array (Mary Ann Vowels); fingerprint evidence; local police reports (concerning alternative suspects and other robberies); internal FBI reports (opining that different perpetrators committed different robberies, and that the robber had brown eyes), certain witness statements (Kara Fields, Karen Gomes,

14

Paula Hopkins, and other unnamed witnesses), and documentation about the "bait bill."

*Sullivan II*, at 943. The *Sullivan II* Court rejected the fresh *Brady*-claim wave:

> Sullivan has procedurally defaulted on any *Brady* claims concerning [the Vowels, Fields, and Gomes] documents because his appellate counsel, who had these documents, did not raise these claims on direct appeal.
>
> . . . .
>
> As for the remainder of the documents allegedly withheld in violation of *Brady*, Sullivan raised those in his § 2255 motion, the magistrate judge rejected those claims in the R&R, and the district court adopted the R&R, thereby rejecting those claims in its judgment. Because Sullivan did not file objections to the R&R, he waived his right to appeal.

*Id.* at 944–45. The Sixth Circuit also declined to "supplement the record and admit hundreds of pages of alleged *Brady* material that Sullivan obtained via FOIA." *Id.* at 945.

Undeterred, Sullivan advances a host of evidence suppression allegations. In the years since his initial appeal, and during his previous § 2255 round, Sullivan amassed over 1,000 document pages via FOIA and ORA requests. DE 420, at 1–2. He alleges the prosecution improperly withheld this collateral record, and that its contents "literally [turn] the government's case upside down." DE 407-1, at 8. Sullivan groups his various conclusory allegations by what he believes the evidence would have proven if timely disclosed. He claims the documents would have (1) impeached Special Agent Doug Warner's testimony on multiple bases; (2) shown that all evidence related to the Heritage Bank robbery was fabricated; (3) demonstrated that the PowerPoint presentation the Government used during its opening statement was misleading and false; and (4) impeached other key witnesses. *Id.*[13]

---

[13] The allegedly supportive documentation is not in the official record. *See* DE 371 & 373 (Orders striking Sullivan's 603-page § 2255 submission); DE 375 (Order denying Motion to Exceed Page Limit); DE 381 (Order denying reconsideration of DE 373 and ordering submitted pages over 40 stricken); DE 390 (Sixth Circuit Order dismissing appeal of page-limit reconsideration denial); DE 401 (Order denying Motion to Expand the

Despite Sullivan's persistence—both in pursuing investigative documents and pressing *Brady* claims—he does not identify any materially favorable suppressed evidence. The Court's confidence in Sullivan's conviction remains entirely unshaken.

### A. Relevant Standards

A *Brady* claimant must prove that (1) evidence was favorable to him, because it was either exculpatory or impeaching, (2) the Government suppressed the evidence, either willfully or inadvertently, and (3) he was prejudiced by the nondisclosure, *i.e.*, the undisclosed evidence was material to either guilt or punishment. *Stickler v. Greene*, 119 S. Ct. 1936, 1948 (1999). *Brady* "is concerned only with cases in which the government possesses information which the defendant does not, and the government's failure to

---

Record); DE 404 (Order overruling objections to DE 401); DE 408 (Order denying renewed request to exceed page-limit); DE 422 (Order granting consideration of three excess pages in DE 420). Thus, the Court could summarily deny the *Brady* claims—and indeed is inclined to do so given Sullivan's cumulative and vexatious approach—as unsupported by any documentation. *See Martinez v. United States*, 865 F.3d 842, 843 (6th Cir. 2017) (affirming § 2255 dismissal based on movant's repeated failures to file a page-limit-compliant motion), *cert. denied*, No. 17-7487, 2018 WL 942800 (Feb. 20, 2018). The Court repeatedly told Sullivan he had but 40 pages. He utilized those pages to submit multitudinous and repetitive claims rather than including (and effectively citing to) evidence that purportedly would stand the Government's case on its head.

Additionally, the Court notes that Sullivan fails to authenticate any tendered exhibit. His reply is also unsworn. Unauthenticated documents are not properly subject to consideration. *See Garcia v. United States*, Nos. 1:11CR253-3, 1:14CV150, 2015 WL 7283136, at *2 n.5 (M.D.N.C. Nov. 16, 2015) (collecting cases and holding unauthenticated documents not proper evidence in § 2255 proceedings). Nonetheless, in the interest of reaching a final conclusion to Sullivan's post-conviction saga, the Court relies on the subsequent merits analysis to recommend dismissal.

Accordingly, the Court has endeavored to locate the relevant documentation that is central and that it can identify within Sullivan's proposed (and rejected) supplemental filings, and will consider Sullivan's reply arguments. If warranted, and as appropriate, the Court, in its discretion, will direct the Clerk to file a limited tranche of relevant collateral documents (in the official record) contemporaneously with this Recommended Disposition. *See* Rule 7, Rules Governing § 2255 Proceedings (Rule 7). Though Rule 7 does not explicitly reference *sua sponte* record supplementation, the 2004 amendment notes state that "Rule 7(a) is not intended to restrict the court's authority to expand the record through means other than requiring the parties themselves to provide the information."

disclose the information deprives the defendant of a fair trial." *United States v. Mullins*, 22 F.3d 1365, 1371 (6th Cir. 1994). *Brady*'s prejudice/materiality prong is not satisfied "by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 115 S. Ct. 1555, 1566 (1995). Undisclosed evidence materiality is measured "collectively, not item by item." *Id.* at 1567.

The Court must assess any suppressed evidence's significance against the strength of the prosecution's case. *See United States v. Agurs*, 96 S. Ct. 2392, 2402 (1976) ("[I]f the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt."). The magnitude of any exculpatory or impeaching effect (and the relevant witness's relative importance, where applicable) determines any alleged *Brady* materials' tendency to enervate verdict confidence. *See, e.g.*, *Apanovitch v. Bobby*, 648 F.3d 434 (6th Cir. 2011) (Evidence the Government withheld "would have enabled Apanovitch to dispute only the very weakest of the prosecution's evidence[.]"), *cert. denied*, 132 S. Ct. 1742 (2012).

For example, evidence impeaching a key witness is more likely material, and its suppression more likely prejudicial. *Eakes v. Sexton*, 592 Fed. App'x 422, 429 (6th Cir. 2014). However, evidence that permits only cumulative impeachment, or impeaches only cumulative testimony, is immaterial for *Brady* purposes. *See, e.g., Banks v. Dretke*, 124 S. Ct. 1256, 1278 (2004) ("The witness whose impeachment was at issue . . . gave testimony that was in the main cumulative[.]); *Tankleff v. Senkowski*, 135 F.3d 235, 251 (2d Cir. 1998) ("When a witness's credibility has already been substantially called into

question in the same respects by other evidence, additional impeachment evidence will generally be immaterial and will not provide the basis for a *Brady* claim.").

Importantly, as to several Sullivan claims, "[t]here is no *Brady* violation if the defendant knew or should have known the essential facts permitting him to take advantage of the information in question, or if the information available to him was available from another source." *United States v. Tavera*, 719 F.3d 705, 716 (6th Cir. 2013) (quoting *Jones v. Bagley*, 696 F.3d 475, 487 (6th Cir. 2012); *see also Doan v. Carter*, 548 F.3d 449, 460 (6th Cir. 2008) (holding that failure to disclose potentially impeaching information known to defense counsel "cannot form the basis of a *Brady* violation"). Information "available from another source" includes "information that is available from public records, *e.g.*, of a witness's criminal record." *Gillispie v. Timmerman-Cooper*, 835 F. Supp. 2d 482, 507 (S.D. Ohio 2011) (citing *Storey v. Vasbinder*, 657 F.3d 372, 380 (6th Cir. 2011)).

Sullivan centrally contends the Government's non-disclosure of two general categories of evidence violated *Brady*. First, Sullivan relies on evidence logs regarding two key pieces of evidence—U.S. currency stolen from Heritage Bank and traced to Sullivan at trial, and the inculpatory fingerprint recovered from Heritage Bank. Sullivan stakes his other *Brady* allegations mainly on various allegedly exculpatory or impeaching investigative reports produced by the various involved law enforcement agencies.

### B.  Evidence Logs

<u>Bait Bills</u>

At trial, Michelle Wilhite, Head Teller at Heritage Bank, testified that two "Bait Bills" (both $20 denomination) were within the funds stolen during the June 11, 2002,

robbery, and later returned to the bank in deposits. *See* DE 195, at 30–34. The first, Serial # L82651403B, per Wilhite, was among a series of night drop deposits made between Heritage's closing on the afternoon of Friday June 14, and reopening the morning of Monday June 17, 2002. DE 195, at 34–37. Wilhite, though uncertainly, testified that, based on the typical composition of other weekend deposits, she believed the bill came from Barrett's Bar. Later testimony from Terri Turner, a Barrett's employee, vaguely placed Sullivan at the establishment during or near the relevant period. DE 195, at 103–07. The second bill, Serial # K61012196B, per Wilhite, was returned within a June 18, 2002, deposit from Northern Kentucky Concessions, a place where, per Sullivan's ex-wife Karen, Sullivan's daughter played basketball. *See* DE 195, at 28-31 (Wilhite); DE 195, at 183–86 (Karen Sullivan). Defendant had given his daughter $200 in $20s around that time. *See* DE 195, at 113 (per Warner), 186 (Karen Sullivan confirming).

Sullivan, based on a Fort Wright Police Department (FWPD) Evidence Log, DE 395-2, at 35, contends the first bill could not have been in the June 14, 2002, Barrett's deposit because police logged it into evidence on June 12, 2002. DE 420, at 11. Facially, the log supports Sullivan's contention. The log could have been used to impeach Wilhite's testimony. The Government's response does not entirely eliminate this concern.

The United States contends—with a supporting evidence log and narrative report (DE 412-10)—that the Bait Bill was discovered at Heritage on June 17, 2002, and placed into evidence the same day. The Government argues the log Sullivan cites simply added the relevant bill (with serial number), when the evidence was released to the FBI. The Court questions why the release information would not have simply been listed on the newly submitted log. Because "cumulative materiality [is] the touchstone[,]" the Court

makes no conclusion as to prejudice at this stage. *Kyles*, 115 S. Ct. at 1569; *see infra* Part IV. D. (discussing materiality).

Sullivan, attacking both Bait Bills, also alleges other (non-Barret's Bar) night deposits were withheld, and that such deposits would have impeached by dilution Wilhite's bait-bill-source testimony. He relies on a handwritten night deposit log, and the "item count" located at the base of the relevant deposit slips.[14] *See* DE 395-2, at 38–40.

The deposit slips' "item count" figures do not support the nefarious inference Sullivan seeks. DE 420, at 10 (alleging "the United States withheld other deposits that the alleged Bait Bills could have come from"). Affiant Shane McQueary, Heritage Bank manager (formerly Heritage teller and eyewitness), explains that the "item count" simply reports the number of documents in the bank's system that are returned based on the search criteria. DE 412-9 (McQueary Affidavit). Such criteria do not necessarily indicate or imply specific dates—or specific amounts—and a higher item count does not indicate that there were undisclosed same-day deposits. *Id.* Sullivan's counterpoint is speculation.

Nor does the handwritten night deposit log impeach Wilhite's testimony. Wilhite consistently testified that she could not be certain the June 17-recovered bill came from Barrett's Bar because it came in with other deposits. DE 195, at 33 (Direct), 38 (Cross). Wilhite herself identified several other possible sources, and explained the underlying rationale for her belief that the bill came from Barrett's. *See id.* at 33 ("The churches usually make deposits with checks and a lot of singles, a lot of fives. And Snappy Tomato Pizza seemed like more and more people used checks to pay for their pizza, and a limited amount of currency."). Defense counsel (Kerry Neff) was clearly aware that the alleged

---

[14] The deposit slips were part of the trial. They were, in fact, Government exhibits. DE 195, at 31–32. However, Sullivan (erroneously) infers the existence of undisclosed evidence from the obviously disclosed documents.

Barrett's bill came from a multi-deposit pool, and he made sure to highlight that fact for the jury. *See id.* at 38 ("It could have come from Snappy's Tomato? . . . It could have."). Finally, there is no evidence the second bill came from a night deposit and, thus, the night deposit log is irrelevant to that analysis.

<u>Fingerprints</u>

FWPD Officer Jamie Puthoff[15] lifted Sullivan's print from the door of Heritage Bank. *See* DE 194, at 192–93. Officer Puthoff testified that she took the bagged fingerprint evidence to "headquarters and locked it into evidence." *Id.* at 194. Sullivan claims an undisclosed FWPD evidence log impeaches Officer's Puthoff's testimony because it shows the prints were logged at 6:50 a.m. the day after the robbery. DE 420, at 3–4. Sullivan is incorrect. Puthoff never testified that she immediately took the prints to headquarters. In fact, she stated that she did not have the log-in/log-out timing documentation with her, but that the relevant information would be on the log at her office. DE 194, at 195 ("So that information would be on the log at your office . . . [p]ut in a certain time, and taken out a certain time? A. Yes."). The log would not have impeached Puthoff.

To the extent Sullivan is arguing that the log "is favorable to him because it would have alerted him to . . . potential chain of custody, authentication, and best evidence" issues, he is wrong. *United States v. Knowles*, 623 F.3d 381, 388 (6th Cir. 2010). "The [log, if anything,] corroborates [Officer Puthoff's] testimony and is therefore inculpatory evidence." *Id.* Even if the Court concluded that the log arguably raised (an

---

[15] The Court's admonition to Sullivan regarding unsworn and unauthenticated documents applies with greater force to the United States. Thus, the Court does not consider Officer Puthoff's unsworn affidavit. The Court understands that the affidavit went uncompleted because of Officer Puthoff's death. However, the United States does not argue any evidentiary exception.

unspecified) argument as to fingerprint admissibility, Sullivan could not prove materiality. *Kyles*, 115 S. Ct. at 1566 (Materiality is not shown "by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."). With or without the log, there is no reasonable probability that the fingerprint would have been excluded. *Knowles*, 623 F.3d at 386 ("[I]n order to admit physical evidence, the possibility of misidentification or alteration must be 'eliminated, not absolutely, but as a matter of reasonable probability.' " (internal citation omitted)). Sullivan has nothing but speculation over the overnight retention; Puthoff testified, properly authenticated the fingerprint evidence, and nothing Sullivan argues calls that admissibility into doubt. Therefore, the prosecution's failure to disclose the fingerprint log was not a *Brady* violation.

### C. Reports

#### BCSO Lineup & Report

In November of 2000, the Boone County Sheriff's Office (BCSO) prepared a lineup that included Sullivan. DE 406-1, at 34 (report), 36 (lineup). BCSO showed the lineup to Mary Ann Vowels—a PNC Bank teller supervisor present during the October 25, 2000, robbery—and Ms. Vowels "advised that it didn't appear to be anyone of them[,]" but "that it looked like #5 (Mr. Sullivan) but skinner [sic]." *Id.* at 34. The Government concedes that it did not, pretrial, disclose the lineup or this portion of the report. DE 412, at 11. At trial, Vowels identified Sullivan as the robber. DE 196, at 59.

The Court finds the Government's suppression, in this instance, somewhat concerning. A prior failure to fully identify Sullivan may have had impeaching value.

However, the relevant report does not carry the exculpatory or impeaching effect that Sullivan claims. *See, e.g.*, DE 407-2, at 15; DE 420, at 12 (characterizing the report as demonstrating "that Agent Warner committed perjury and the United States withheld exculpatory and impeaching evidence that [ ] impeded upon the Defendant's ability to plead his case"). Nonetheless, the Court will consider the report in the *Kyles* collective-materiality assessment below. *See infra* Part IV. D. (discussing materiality).

Other Fingerprints

Sullivan contends that suppressed reports of unidentified prints taken from various banks would have materially aided his defense. The Court disagrees. The number of non-exculpatory inferences available from non-matching print removal overwhelmingly outweighs the single Sullivan-favorable possibility. For example, if the prints were unidentifiable they would "prove[ ] only a neutral point—that someone, anyone (including potentially [Sullivan]), touched" bank surfaces. *United States v. Howard*, 516 F. App'x 409, 411 (6th Cir. 2013). At most, any reports indicating prior print recovery at other banks "showed that the government lacked fingerprint evidence pointing to [Sullivan for those counts], a truth he already knew." *Id.* Officer Puthoff and Agent Warner both acknowledged the existence of non-matching prints at trial. DE 194, at 204 (Puthoff); DE 198, at 76 (Warner). Sullivan's counsel highlighted this unsurprising fact. DE 198, at 76 ("Okay. Only one print was found that had identified Mr. Sullivan? . . . There were many other prints found; correct?"); DE 195, at 132 ("There were no prints taken from any of the banks prior to the Heritage Bank that led to a suspect?"). The only way other prints would favor Sullivan is if he could show they were (A) identifiable, (B) came from the bandit, and (C) did not match Sullivan. The only identifiable prints tied to

23

the culprit were Sullivan's, and nothing in Sullivan's proposed exhibits indicates otherwise. The presence of unidentifiable or non-Sullivan fingerprints at public businesses, without more, is not exculpatory.

Sullivan also argues the above reports impeach Agent Warner's testimony that no other prints were, "considered evidence." DE 195, at 131. The reports do not contradict Warner's testimony. The reports say nothing about whether Warner "considered" the prints evidence. Again, Warner stated at trial that there were other prints. Thus, Sullivan had, and his counsel used, the relevant report information. Any report-based impeachment would simply have been cumulative.

In sum, even if the non-Sullivan-print reports had impeachment value, the information "was available from another source." *Tavera,* 719 F.3d, at 716. Agent Warner and Officer Puthoff acknowledged the existence of other prints at trial. The at-issue reports were not exculpatory, and any suppression was not *Brady*-violative.

Relatedly, Sullivan argues that a FOIA-retrieved report indicates his prints were recorded by police since 1979. He believes this fact enhances the exculpatory effect of the non-Sullivan prints. This claim, too, fails. Sullivan's prior fingerprinting does not change the character of the non-Sullivan print evidence. The Government has never argued that insufficient comparison data prevented additional Sullivan matches. The FBI plainly had Defendant's prints in its system prior to the AFIS hit. Further, Sullivan "knew or should have known the essential facts permitting him to take advantage of the information in question." *Tavera,* 719 F.3d, at 716. That is, he was obviously present during his own 1979 fingerprinting.

In short, the prior-printing report is not independently Sullivan-favorable; it does not convert the other print recoveries into exculpatory evidence, and Sullivan was, or should have been, aware of the information. Non-disclosure was no *Brady* violation.

<u>When Sullivan Became a Suspect</u>

At trial, Agent Warner testified that Sullivan "officially became a suspect" after the FBI received "a print match on the AFIS system." DE 195, at 132. Sullivan claims that authorities were investigating him behind the scenes, and that undisclosed, and unidentified, reports show he was a "suspect" all along. *See, e.g.*, DE 407, at 8 ("[W]ithheld reports clearly demonstrate that Agent Warner's theory that . . . the Defendant did not become a suspect until the alleged fingerprint AFIS hit . . . was not true."); DE 420, at 8 ("[Agent Warner] and Ft. Wright Police were behind the scene running their investigation of Defendant."). Sullivan does not specify particular documents. In any event, evidence showing the FBI in some way suspected Sullivan prior to the AFIS hit would have been cumulative. Warner conceded on cross that he believed Sullivan was a suspect in 2000 before, at that point, ruling him out. DE 198, at 76–77; *see also* DE 195, at 134 ("When I initially interviewed Mr. Sullivan at that time, I did not believe he was involved in the . . . October 25th robbery of 2000."). The jury knew law enforcement assessed Sullivan as a suspect before the Heritage crime. DE 195, at 133 (Boone County also considered Sullivan a suspect in 2000.).

Cutting through Sullivan's hyperbole, the Court simply cannot discern how information suggesting Sullivan was a suspect before the fingerprint match benefits his case. There is no impeachment value. Warner explained that he does not consider someone a true suspect until he is "comfortable that there is probable cause that an

individual committed a certain act." DE 195, at 167.[16] Documentation showing that the FBI, or any other organization, *suspected* Sullivan is not proof that Warner considered him an *official suspect*.[17]

Even if the Government suppressed evidence showing Sullivan was being investigated "behind the scenes" there was no *Brady* violation. Sullivan, again, "knew or should have known the essential facts permitting him to take advantage of the information in question." *Tavera,* 719 F.3d, at 716. Sullivan believes an undisclosed investigation carries devious import. At least here, it does not. A veiled investigation is the norm, not the exception. Evidence that law enforcement did not provide status updates to Sullivan as they built their case would not have influenced Sullivan's jury, and additional proof of Sullivan's earlier (disclosed) unofficial suspect status makes Warner

---

[16] Sullivan also pursues grave inferences based on discrepancies in Mary Ann Vowels's purported lineup identification date. DE 407-2, at 3 ("The jury never knew that Mary Ann Vowels ID'd the Defendant behind the scenes one week before the alleged AFIS hit when the jury only learned that the Defendant was not a suspect until the AFIS hit[.]"). Vowels dated her photospread signature July 3, 2002; one week before the AFIS hit. Most importantly, the lineup, date included, was never suppressed. Indeed, the relevant lineup was a trial exhibit. DE 197, at 21 (admitting "Photo Spread No. 2[,]" containing Vowels's and Pittman's signatures, through Bonnie Pittman). Further, the United States provides a valid and, unlike Sullivan's theory, substantiated explanation for the date variation. DE 412, at 7 ("The only explanation for Vowels writing a date seven days before the Heritage Bank robbery occurred, is that she did so accidentally."). Other than the disclosed dated signature, there is no proof that Vowels viewed the lineup on July 3. However, significant evidence corroborates a post-July signing. Every other lineup signature was from August. DE 395-2, at 20. There is no dispute that Agent Warner showed Vowels the lineup, and Warner's employment records clearly show he was on vacation July 3rd. DE 407-2, at 16 ("Agent Warner . . . gets Mary Ann vowels to ID the Defendant[.]"); DE 412-1 (Warner Aff. & Employment Records). In sum, the signature date was an unsuppressed, immaterial fact.

[17] Additionally, evidence that the FBI previously cleared Sullivan certainly lends no credence to Sullivan's conspiracy theory. To the contrary, prior clearance shows thoughtful deliberate investigation, not intent to frame.

no less credible for identifying a later official suspect status date. The fingerprint match was the obvious inflection point. The Court rejects the *Brady* claim.

Not a Single Robber

Sullivan alleges that "withheld reports clearly demonstrate that Agent Warner's theory that all the charged robberies were committed by a sigle [sic] robber, that all were part of a single string was not true." DE 407, at 8. Sullivan does not specify particular documents, but, in reply, claims that FOIA reports show that the FBI closed its case file on the first three robberies, believing the robber ceased his activity, and that the FBI believed the fourth through eleventh robberies constituted a separate string. DE 420, at 13. The Court, even taking Sullivan at his word on the description, finds no *Brady* violation.

The reports, as alleged, contain various individuals' then-existing beliefs or hypotheses about connections between a series of robberies occurring over several years, and in multiple jurisdictions. They are neither impeaching nor exculpatory. *See D'Ambrosio v. Bagley*, 527 F.3d 489, 499 (6th Cir. 2008) ("It cannot be the law that every stray thought of a police detective about a case must be imputed to the State, such that the prosecutor has a duty to disclose that information[.]"). Much like the existence of non-Sullivan fingerprints, authorities' failure to immediately connect the robberies is not evidence, and does not support Sullivan's innocence. The reports show only that a particular author, on the reporting date, and without the correlative aid of an identified suspect, had not connected all twelve robberies. This neutral and unsurprising fact is not favorable to Sullivan and simply reflects evolving proof of crime.

27

Further, the mid-investigation reports are not inconsistent with witness testimony occurring after the investigation culminated. Apparent inconsistencies or outliers in the short-term can, with additional facts—*e.g.*, if a particular suspect is identified—prove trend-consistent over a longer period. This is the nature of unsolved crime and investigation. The FBI ultimately concluded that one individual (Sullivan) committed all the robberies. The Court will not construe law enforcement's failure to instantly solve the spree as undercutting the ultimate prosecution theory.

Further, even if prior speculation were potentially exculpatory, the reports, in context, are immaterial (and, thus, irrelevant to any cumulative materiality assessment). The jury knew authorities were unable to connect Sullivan to the various robberies during the mid-stream investigation. As discussed above, Warner interviewed and provisionally cleared Sullivan in October 2000. The record showed that the FBI's case theory developed as additional facts emerged. The jury convicted Sullivan. Cumulative proof of the investigation's evolution would not have aided Sullivan. Accordingly, non-disclosure in this circumstance did not violate *Brady*.

<u>Inconsistent Descriptions</u>

Sullivan claims the prosecution withheld reports that would have impeached Agent Warner's theory "that all the descriptions matched." DE 407, at 8; *see also* DE 407-2, at 10 (arguing, in IAC context, that counsel could have impeached Warner's testimony that all robbers had matching descriptions). The Court has meticulously combed the record; Warner never testified that all suspect descriptions matched. Accordingly, the claim empirically fails.

<u>PowerPoint</u>

28

At trial, the prosecution used a PowerPoint presentation during opening statements. Sullivan objects to the PowerPoint in his *Brady*, prosecutorial misconduct, and ineffective assistance claims. *See, e.g.*, DE 407-2, at 19 ("[T]he government's PowerPoint presentation [ ] was cleverly placed in each juror's seat before trial[.]"). Because the PowerPoint presentation, used and created in advocacy, was not evidence, *Brady* created no duty to disclose it. The Court rejects the claim.

### D. Prejudice/Materiality

Per the prior analysis, Sullivan identifies two pieces of undisclosed evidence that would arguably have been favorable to his case: the Bait Bill evidence log, and the BCSO report. The Court, now, must decide whether "disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable." *Kyles*, 115 S. Ct. at 1569. Because there is no reasonable probability that the report and evidence log would have impacted the trial result, the *Brady* claims fail.

Several factors limit the Bait Bill log's impact on materiality, an issue judged collectively. *Kyles*, 115 S. Ct. at 1569. First, the log, if used, would have prompted explanation and counter-evidence from the United States. The counter-evidence strongly shows the chronology of bill receipt and further explains the deposit analysis. Also, the documentation does not refute the prosecution's narrative regarding the other Bait Bill— the more definitive[18] piece of Bait Bill proof. The Bait Bills each came from, and

---

[18] For the first bill, Wilhite could not be certain as to the source deposit, and Terri Turner could not place Sullivan in the bar on any specific date. DE 195, at 107 ("I don't know the dates."). While the Barrett's connection was relevant but tenuous, Wilhite's testimony regarding the second bill was conclusive. DE 195, at 30–31. Karen Sullivan also unequivocally confirmed that her family used a $20 bill at the Town & Country Sports Complex on June 18, 2002. *See* DE 195, at 183–85. Karen Sullivan said she used a $20 from $200 Greg Sullivan had given her daughter Amanda in the May to June period.

returned to, the same bank. Thus, even if the jury relied on the undisclosed log to doubt the questioned Bait Bill, the logs support the redundant second bill. Nothing impeaches receipt of the second bill. The same officer completed the logs using the same evidence-release procedure. *See* DE 395-2, at 35. Again, witness Wilhite directly and affirmatively testified to receipt and identification of each Bait Bill.

Further, the log actually contradicts Sullivan's fanciful theory of a multi-organization effort to frame him for the robberies. Officer Puthoff, the log creator for both Bait Bills, is the same person Sullivan alleges falsified fingerprint evidence after the Heritage robbery and, subsequently, committed perjury as part of the cover up. *See e.g.*, DE 420, at 9. Sullivan does not explain why, if she would go to such lengths to frame him on June 11 (and again at trial), she would faithfully record police custody of a central piece of law-enforcement's framing efforts on June 12, before it could be used in the plot. In short, the evidence the Government withheld would have, at best, "enabled [Sullivan] to dispute only the very weakest of the prosecution's [Bait Bill] evidence"—the Barrett's bill. *Apanovitch*, 648 F.3d at 438. The log's hypothetical use at trial, standing alone, does not disturb the Court's confidence in Sullivan's guilt.

The BCSO report on Mary Ann Vowels's photo lineup examination following the PNC robbery is similarly limited. Certainly, Vowels did not explicitly identify Sullivan as the perpetrator at that time, but the photograph was only a headshot, and she indicated that Sullivan's picture looked like the culprit. The report potentially offered a narrow impeachment basis for Mary Ann Vowels. However, the Court finds it at least equally likely that evidence of the near-identification would have bolstered the in-court

---

Recall that Greg Sullivan admitted to Warner that he had given $200 to Amanda in the June period. *See id.* at 113.

identification. The jury had the chance to observe Vowels, see the robber photos, and see Sullivan.

Even if the report gave the jurors reason to doubt Vowels, and even if she was— as Sullivan contends—a "key witness," the Vowels-impeaching evidence is not categorically material. *See United States v. Crumpton*, No. 13-20842, 2017 WL 5158834, at *3 (E.D. Mich. Nov. 7, 2017) ("The Sixth Circuit has emphasized that impeachment evidence is material where the key witness' testimony is one of the only pieces of evidence linking the defendant to the offense." (internal citations omitted)). Vowels was one of a slew of eyewitnesses that identified Sullivan as the bank robber. As the Sixth Circuit stated, "the prosecutor produced 25 eyewitnesses to describe the robber and the robberies. More importantly, 15 of those eyewitnesses . . . specifically identified Sullivan as the robber." *Sullivan II*, 587 F. App'x at 937. With or without Vowels's testimony, the Government had plenteous proof to secure Sullivan's conviction. *Compare Harris v. Lafler*, 553 F.3d 1028, 1033 (6th Cir. 2009) (applying *Brady* where key witness's testimony was the only piece of eyewitness evidence linking the defendant to the shooting, and without it, the case was circumstantial). Having found neither suppressed document independently material under *Brady*, the Court turns to a joint analysis.

*Kyles* requires a collective materiality assessment, but that dictate is difficult to apply when, as here, two pieces of suppressed evidence have little, if any, factual or logical connection. *See* 115 S. Ct. at 1585 ("We evaluate the tendency and force of the undisclosed evidence item by item; there is no other way."). In any event, the BCSO report would not increase the impact of the Bait Bill log; nor would the log increase the report effect. The evidence log and BCSO report come from different law enforcement

agencies, concern different crimes, and relate to disparate evidence types. Their only real connection is potential impeachment of evidence that supports Sullivan's guilt, writ large. The Court can discern no collective effect that varies the documents' individual immateriality.

Sullivan claims Warner was "a desperate man" prior to Movant's arrest. DE 420, at 11. He contends the multiple unsolved bank robberies in Warner's jurisdiction motivated the Agent to fabricate proof, frame a suspect, and manufacture a conviction. Yet, Warner's testimony showed that his performance evaluations did not depend on case resolution rates. DE 195, at 135–36. Sullivan presented his conspiracy theory on the stand, and his counsel pursued it (at least inferentially) while crossing Warner. *Id.* at 127, 134–36; DE 199, at 104. The jury did not believe Sullivan's allegations. The alleged *Brady* evidence does not materially support Sullivan's specious theory,[19] and adds no likelihood (reasonable or otherwise) that the jury would have bought his tale.

Sullivan robbed twelve banks over three years. Unsurprisingly, the multi-agency, multi-jurisdiction, multi-year investigation produced voluminous records. Sullivan spent a decade tracking down those reports. Now, with his *Brady* claims, Sullivan cherry picks from this collateral record evidence he spins into a framing. The Court has meticulously reviewed the record and finds no support for Sullivan's conspiracy theory. In fact, the avalanche of documentation collectively illustrates the total impracticability of the framing effort Sullivan proposes. The documents come from various agencies, in various

---

[19] For instance, Sullivan, under penalty of perjury, postulates that after his arrest Officer Puthoff lifted his fingerprints from a conference room in Boone County and planted them on a falsified Heritage Bank print card for use at trial. DE 407-2, at 23. Yet, the verified record at trial shows that law enforcement submitted the relevant prints, and received a Sullivan match, five days prior to Sullivan's arrest. Movant's time-bending theories do not persuade.

jurisdictions, across a lengthy investigatory period. Sullivan alleges one patently false motive for Agent Warner's involvement in the alleged conspiracy, but he could not be bothered to invent an explanation for the various other parties' (witnesses, law enforcement, attorneys) complicity or active involvement. Every fiction has its limits.

"[C]onfronted with a forest of evidence against him, Sullivan . . . ha[s] taken aim at a few stray branches, at which [he] hack[s] away virulently in an apparent hope that we might mistake these branches for the forest itself. But the forest of evidence is overwhelming—the prosecutor proved Sullivan was guilty[.]" *Sullivan II*, 587 F. App'x at 937. Impeaching one of fifteen eyewitnesses, and one of two Bait Bills, with questionably impactful evidence, would not, with any reasonable likelihood, have changed the trial result. The Court maintains full confidence in the verdict.[20]

## V.    OTHER PROSECUTORIAL MISCONDUCT CLAIMS

Sullivan also presses three non-*Brady* prosecutorial misconduct theories.[21] He contends the Government (1) presented false testimony, (2) fabricated or altered evidence, and (3) made improper in-court statements. DE 407, at 9. Sullivan fails to substantiate any of these allegations, and the Court rejects them.

First, and again, Sullivan defaulted these claims by failing to present them on direct appeal. He had the bases now presented at the time of direct appeal (originally, in

---

[20] Sullivan vaguely, and only in reply (and, thus, having doubly defaulted the issue), claims that "(ORA) clearer footage shows that the shirts" and tennis shoes taken from Karen Sullivan's residence do not match the robber's. DE 420, at 14. The jury had the surveillance photographs and the clothing. Whether jurors found them matching, or were not troubled by any discrepancies, the jury ultimately convicted. Sullivan, on this basis, creates no doubt in the verdict.

[21] Sullivan also reiterates—not for the last time—one of his *Brady* claims. *See, e.g.,* DE 407, at 9 ("The prosecution withheld" the BCSO lineup.). The Court declines Sullivan's invitation to readdress a claim once analyzed.

many cases, and certainly on the direct appeal opportunity following resentencing). *See supra* Part III. He makes no cause and prejudice showing and does not meaningfully address actual innocence. The claims stand defaulted without excuse.

### A. *False Testimony*

Federally, "the Due Process Clause guarantees the fundamental elements of fairness in a criminal trial." *Spencer v. Texas*, 87 S. Ct. 648, 653 (1967). The relevant inquiry is whether "the introduction and identification of the [challenged evidence] so infused the trial with unfairness as to deny due process of law." *Lisenba v. California*, 62 S. Ct. 280, 286 (1941). "Under *Napue v. Illinois*, 360 U.S. 264, 269–72 (1959), a defendant is denied due process if the prosecutor knowingly offers or fails to correct false testimony." *United States v. Willis*, 374 F. App'x 402, 404 (4th Cir. 2010). "The knowing use of false or perjured testimony constitutes a denial of due process if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. In order to establish . . . denial of due process, the defendant[] must show (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false." *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998).

<u>Warner</u>

Sullivan insists that the prosecution suborned perjury from Agent Warner regarding "every material aspect of Defendant's case[.]" DE 407-2, at 19. Specifically, he claims Warner lied about: (1) the date Sullivan became a suspect; (2) all robberies being committed by the same individual; (3) all robber descriptions matching; (4) the absence of other fingerprints considered evidence; (5) who retrieved the baseball hat matching Joshua Sullivan's team hat and the hat worn by the Heritage Bank robber; (6) being at

Heritage Bank on June 11, 2002, after the robbery; and (7) who pulled Sullivan's fingerprints from the Heritage Bank door. *Id.* at 2, 6 19, 21.[22] For the first four allegations, Sullivan's claimed falsity proof consists of the exact same documents relied on for his analogous, unsuccessful *Brady* efforts. The Court will not rehash the full analysis, but makes a couple of observations: Just as the cited documents did not impeach Warner's testimony, they certainly do not prove its falsity. And, again, Warner never testified that all descriptions matched. The Court turns to the three new allegations.

Agent Warner, at trial, testified that he obtained a baseball cap from Rob Sanders. DE 195, at 142–43. Sanders, a baseball coach, testified that Government's Exhibit 3 matched a hat he gave to the Government, *id.* at 20, and that the league issued an identical hat to Sullivan's son. *Id.* at 18–19. Karen Sullivan confirmed that Sanders issued her son a uniform, that she was able to locate the uniform pants, and that the hat was missing. *Id.* at 182–83.

Sullivan stakes his perjury claim on Warner's pretrial statement that FWPD obtained the hat. DE 407-2, at 3. The Government explains that FWPD obtained an identical hat, based on a dispatch description, shortly after the Heritage Bank robbery and brought it to the bank for eyewitnesses to compare with their recollections. DE 412, at 13. Contrary to Sullivan's self-serving speculation, the two hat acquisitions are not inherently inconsistent. Sanders explained that the league procured 10-12 dozen such hats in the three years preceding trial. DE 195, at 19. Both Warner and FWPD could have obtained hats from different sources that were from the same origin and, for all relevant purposes, identical. The Government response so indicates. DE 412, at 13 ("Park Hills Police

---

[22] Sullivan's scattershot briefing does not directly tie claim (6) or (7) to the prosecutorial misconduct relief basis. Nonetheless, the Court, granting the lenience due a *pro se* litigant, perceives them as suborned perjury allegations.

Officer Robert Ford was on patrol and recognized the [broadcast] hat [description] to be one issued by the local Bluegrass Baseball League. He quickly retrieved an identical hat, which he had access to, and gave it to Officer Michael Knight."). Sullivan, offering Warner's pretrial statement, does not meet *Napue*'s falsity prong.

The claim also fails under *Napue*'s second and third prongs. Whatever the source, Sanders authenticated the hat, and it matched the hat from the Heritage Bank robbery surveillance. The hat retriever's identity was, in the case context, immaterial.[23] Further, as with each *Napue* claim, Sullivan utterly fails to offer proof of prosecutorial knowledge.

Next, Sullivan claims Warner lied about being on vacation on June 11, 2002— when Heritage Bank was robbed—and falsely testified that Officer Puthoff misspoke when she claimed Warner was present. *See* DE 407-2, at 2 (Sullivan's theory); DE 195, at 120 (relevant testimony). In addition to Puthoff's misstatement, Sullivan submits two letters from FWPD Chief Daniel Kreinest indicating that Warner was one of the FBI Agents who responded to Heritage. DE 406-1, at 21–22. The Government responds with affidavits from Kreinest and Warner refuting Sullivan's claim, as well as Warner employment records substantiating the vacation. DE 412-1, 412-2. The Court does not see falsity here. Kreinest self-corrected (under oath) and explained his prior mistake. Warner testified about his absence, correcting Puthoff during the trial. The objective records and documentation substantiate the Agent's version. Warner did not lie about his location at the time.

---

[23] Sullivan suggests that the same hat being on the scene just after the robbery might have offered exculpatory arguments. The Court rejects the suggestion. The witnesses testified to the hat description and recognition, and when or if they saw a matching exemplar would have had no material value for the defense. The jury viewed for itself the hat and the pictorial evidence from the Heritage robbery.

Further, whether Warner was at Heritage Bank or on vacation on June 11 is, on this record, immaterial. Sullivan offers no evidence that Warner was involved in any way with print removal or delivery. In fact, Officer Puthoff (whom Sullivan apparently finds credible only for providing a roster of Heritage Bank crime-scene investigators)[24] testified she pulled the relevant print on her own, and that it remained in evidence until she took it to the Covington Crime Lab. *See* DE 194, at 191, 195.

Finally, Sullivan claims, based on grand jury testimony, that Warner lied when he testified "that he himself pulled the Defendant's fingerprints and [sic] were the ones used for comparison purposes." DE 407-2, at 6. The alleged testimony does not exist. Warner, at trial, did confirm that he "rolled" Sullivan's fingerprints, but never alleged he "pulled" them. DE 195, at 116. The claim justifies no further review.

In sum, Sullivan's falsity and materiality showings fall short, and he offers no prosecutorial knowledge proof. The *Napue* claims based on Warner's testimony fail.

### Other Key Witnesses

Sullivan vaguely states that the prosecution "used key witnesses [sic] perjured testimonies[.]" DE 407, at 9. He does not identify these players. The Court perceives the claim as an attempt to bootstrap unsuccessful *Brady* claims into *Napue*. The *Brady* predicates failed, and no undisclosed evidence established perjury. Further, Sullivan, again, provides no evidence of prosecutorial knowledge. To the extent Sullivan attacks the eyewitnesses, the claim has already—though in an alternative form—been rejected:

---

[24] Sullivan, clearly, is willing to whipsaw between finding Puthoff credible for purposes of Warner's presence, but incredible for anything that supports his guilt. *See* DE 420, at 4 (arguing Puthoff's testimony "now known to be not credible to the most important evidence in the Defendant's case"). This self-serving tendency is one of a host of factors that detract from Sullivan's credibility.

> Sullivan contends that this eyewitness testimony is insufficient to support his convictions because some of the eyewitnesses either did not get a "decent look" at the robber, gave conflicting descriptions of the robber's eye and hair color, or were unable to identify Sullivan as the robber in the courtroom. However, the record reveals that Sullivan's counsel conducted thorough cross-examinations of each of these eyewitnesses with the apparent intention of highlighting these inconsistencies and deficiencies. The cross-examination was a legitimate attempt to undermine the credibility of these witnesses in front of the jury. While that exercise was appropriate at trial, we decline Sullivan's invitation to substitute our judgment for that of the jury in weighing the credibility of these witnesses.

*Sullivan I*, 431 F.3d at 983–84. The Court agrees with the Sixth Circuit's thoughtful analysis, and Sullivan presents no new evidence that would cause the Court to doubt eyewitness credibility in the § 2255 context. The "other witness" *Napue* allegation is unsupported by proof of falsity or prosecutorial knowledge, and, thus, wholly meritless.

### B. Fabricated or Altered Evidence

Sullivan claims the prosecution presented fabricated Bait Bill and surveillance evidence. Because Sullivan's alleged proof utterly fails to support his outlandish assertions, the Court rejects them.

A prosecutor may violate the Due Process Clause by doing "something to subvert the very foundation of the trial, something that [keeps] the factfinder from making a fully informed decision." *Stumpf v. Robinson*, 722 F.3d 739, 750 (6th Cir. 2013). For instance, a prosecutor's "consistent and repeated misrepresentation" of pivotal case evidence violates due process. *Miller v. Pate*, 87 S. Ct. 785, 787 (1967). The prosecution also has a duty to correct false evidence "when it appears." *Napue*, 79 S. Ct. at 1177. As with suborned perjury, the ultimate test is whether "the acts complained of [are] of such quality as necessarily prevents a fair trial." *Lisenba*, 62 S. Ct. at 290.

The Court has fully reviewed the record, and Sullivan's alleged fabrication proof. "Nothing misleading or deceitful happened here." *Stumpf*, 722 F.3d at 749. The Court finds no false evidence; Sullivan received due process.

### Bait Bills

Sullivan calls the Bait Bill evidence fabricated. He does not explain. The Court rejects Sullivan's attempts to recast the Bait-Bill-*Brady* allegation as a fabrication claim. He offers no fabrication proof. Accordingly, the Court rejects the renewed claim on the same grounds as the *Brady* formulation above.[25]

### Surveillance Footage

Sullivan claims that the Government improperly altered or enhanced still photos taken from the surveillance footage. His sole basis is Warner pretrial testimony that certain footage was grainy. Sullivan's claim is entirely speculative. While Sullivan may have perceived the photos used at trial as clear, Warner may have believed them (or their source film) grainy. Warner's subjective pretrial assessment of a photograph's clarity is not evidence of later fabrication. Defense counsel was able to inspect all surveillance imagery pretrial and, to date, has never doubted the authenticity of any case evidence. DE 412-8 (Neff Aff.). The Heritage Bank Vice President authenticated the photos, admitted over counsel's objection. DE 194, at 224–226 (Christopher Caddell Testimony).

Sullivan's proof does not support surveillance film or photo alteration, and the record establishes the footage's authenticity. Thus, the claim fails.

---

[25] Sullivan also briefly calls the team hat fabricated evidence. DE 407, at 9. Again, he fails to elaborate. To the extent Sullivan is referencing the physical object itself, the fabrication claim is nonsensical, and he offers nothing in support. *See, e.g.*, DE 420, at 7 (discussing the "alleged hat"). Rob Sanders authenticated the hat as one of the 120–144 hats he procured for the pertinent baseball team. DE 195, at 19. If the reference is to the surveillance footage, the Court addresses the claim below.

### C. Improper Statements

For Sullivan's remaining prosecutorial misconduct claims, which focus on the prosecutor's in-court acts, the Court must "determine first whether the statements were improper." *United States v. Francis*, 170 F.3d 546, 549 (6th Cir. 1999) (citing *United States v. Krebs*, 788 F.2d 1166, 1177 (6th Cir.1986)). "If they appear improper, we then look to see if they were flagrant and warrant reversal." *Id.* (citing *United States v. Carroll*, 26 F.3d 1380, 1388 (6th Cir. 1994)). "To determine flagrancy, the [Sixth Circuit standard] is: 1) whether the statements tended to mislead the jury or prejudice the defendant; 2) whether the statements were isolated or among a series of improper statements; 3) whether the statements were deliberately or accidentally before the jury; and 4) the total strength of the evidence against the accused." *Id.* at 549–50 (internal citations omitted).

### Witness Vouching

Sullivan alleges impropriety in the prosecutor's suppression hearing statements. There, the prosecutor represented that Mary Ann Vowels—who was unavailable—would have testified that Agent Warner used proper lineup procedures when seeking a Sullivan identification. DE 412, at 10. Sullivan offers no proof that these statements were either false or prejudicial. Fifteen other witnesses testified consistently with the proffer regarding Ms. Vowels's testimony, and there is no indication that Magistrate Judge Wehrman relied on the proffer to reject Sullivan's suppression effort. *See generally* DE 51 (rejecting suppression and summarizing testimony regarding identification procedures with no mention of Vowels). Even ignoring that the alleged misstatements were made at a pretrial hearing—and obviously not before the jury—Sullivan entirely fails to show

prejudicial effect. The Court rejects the claim. Further, the Court notes that Vowels did not in any way testify at trial about the pre-trial identification, and Warner's procedures were fully and thoroughly before the jury. The prosecutor did not act improperly or in any way taint the trial by representing that the witness would be cumulative at the suppression hearing, a place where the United States presented a full recital of the identification history in the case.

<u>PowerPoint</u>

Sullivan claims the PowerPoint presentation, discussed above, was "misleading." DE 407, at 9. The accuracy of this claim is doubtful, but in any event, Sullivan cannot show prejudice because Judge Coffman twice instructed the jury not to consider things like the PowerPoint as evidence. DE 194, at 149–50 ("[S]tatements and arguments and questions by the lawyers are not evidence."); DE 200, at 106 ("The evidence in this case includes only what the witnesses said while they were testifying under oath; the exhibits that I allowed into evidence; the stipulations or agreements between the lawyers; and the facts that I have judicially noticed."). The PowerPoint was not a trial exhibit. "Defendant guesses that the United Sates [sic] was hoping that the Court was not going to take the time to read all (36) instructions but the Court did not give them that said instruction." DE 420, at 14. Sullivan's "guesses" are not proof, indeed are contrary to the proof.

The Court has already recounted, at length, the strength of the evidence against Sullivan. Sullivan does not explain how the prosecutor's PowerPoint use during opening statements and/or a single pretrial statement tended to prejudice him at trial. Improper prosecutorial intent proof is similarly lacking. The Court, under the relevant standards, rejects the claims of impropriety by Ms. Voorhees.

41

## VI.    RIGHT TO TESTIFY

The trial transcript includes twenty-plus pages of testimony by Sullivan. *See* DE 199, at 88–113. Nonetheless, he claims either the trial court or his counsel denied him the right to testify. DE 407, at 13. Sullivan's central complaint is that counsel asked questions on direct that Judge Coffman recommended, rather than the questions that he and counsel allegedly discussed. *Id.* Sullivan defaulted these issues by failing to present them on direct appeal. He was aware of the claim predicate now presented at the time of both his original and post-resentencing direct appeal. *See supra* Part III. He offers no cause or prejudice showing and raises no colorable actual innocence theory. Further, neither the trial court nor defense counsel violated Sullivan's right to testify. Sullivan's unexcused default dooms his claims initially; they fail on the merits additionally.

A defendant's right to testify derives from the Fifth and Sixth Amendments. *United States v. Bifield*, 702 F.2d 342, 349 (2d Cir. 1983). Although courts are "required to respect [the] right to testify, that right is not without limits. A defendant's right to testify is circumscribed by both the rules of evidence and the court's inherent authority to ensure compliance with those rules. *United States v. Anderson*, 872 F.2d 1508, 1519 n.16 (11th Cir. 1989)." *United States v. Bradley*, 644 F.3d 1213, 1275 (11th Cir. 2011); *see Bifield*, 702 F.2d at 350 (same); *see also Hughes v. Mathews*, 576 F.2d 1250, 1258 (7th Cir.) ("[T]he right of a defendant to present relevant and competent evidence is not absolute and may 'bow to accommodate other legitimate interests in the criminal trial process'[.]"), *cert. denied*, 99 S. Ct. 43 (1978). Federal Rule of Evidence 611(a) directs

> [t]he court [to] exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to:
> > (1) make those procedures effective for determining the truth;
> > (2) avoid wasting time; and

(3) protect witnesses from harassment or undue embarrassment.

Fed. R. Evid. 611(a).

Here, the trial court's ruling regarding the use of narrative was a reasonable and appropriate exercise of control. *See Bradley*, 644 F. 3d at 1275 (holding that trial court, "[f]earing that his testimony would overwhelm the trial," reasonably intervened during defendant's testimony). The trial court, in negative reaction to Neff's narrative approach, raised the possibility of asking the bank-by-bank guilt questions, but did not, contrary to Sullivan's contention, suggest that trial counsel ask them. *See* DE 199, at 92 ("But you will need to ask a specific question, even if it is no more than going through the bank robberies and asking one by one on that day. I don't know what your questions are. But you will have to -- I'm not going to give him a forum just to speak openly."). There is "no constitutional violation in a ruling that might *deter* defendants from taking the stand, so long as it does not *prevent* them from doing so." *United States v. Gunter*, 551 F.3d 472, 483 (6th Cir. 2009) (emphasis in original) (characterizing the holding in *Ohler v. United States*, 120 S. Ct. 1851 (2000)). At most, Sullivan can claim the trial court's ruling deterred additional testimony, but, as the record shows, it certainly did not bar his testimony.

Judge Coffman reasonably perceived the need for a standard Q and A, rather than a method whereby Sullivan would simply narrate an open-ended tale. *See United States v. Beckton*, 740 F.3d 303, 306 (4th Cir. 2014) (finding, in case context, "the district court's refusal to allow [this bank robbery defendant] to testify in narrative form . . . eminently reasonable"). Neff explained his reasoning, but the Court persisted in requiring a typical interrogative method. Sullivan offers no authority depicting that trial management

technique as improper. Although, the narrative form might have been a valid choice by the Court, as explained below, there were countervailing considerations. Judge Coffman had already endured lengthy vacillation by Sullivan on the decision to testify. She had repeatedly had to intervene to stop Sullivan from commenting, raising issues himself, or otherwise speaking up in court. *See, e.g.*, DE 197, at 98–99 ("You need to speak through your attorney. I told you that several times. You understand that?"); DE 198, at 92 (same). She may well have been leery of giving Sullivan the floor. Particularly with a Co-Defendant involved, the narrative form would make regulation of testimony and processing of objections difficult.

Neff's attempt to elicit narrative testimony, though rebuffed by the trial judge, rested on sound practice:

> A defense attorney faced with a client who insists on testifying falsely has few options. The option of informing the court that the client is testifying against advice of counsel and then allowing the defendant to proceed in a narrative fashion has its genesis in standard 7.7 of the ABA's The Defense Function, approved by the House of Delegates in 1971. Under this standard, if the client cannot be dissuaded from perjury and it is too late to withdraw, counsel should invite the defendant "to make his statement to the trier of fact." ABA Standards for Criminal Justice, The Defense Function § 7.7(c) (1971).

*Foster v. Smith*, No. 1:07-CV-854, 2014 WL 1230551, at *14 (W.D. Mich. Mar. 25, 2014), *adopting*, Report and Recommendation, ECF No. 79 (W.D. Mich. Feb. 5, 2014). As explained above, the trial court reasonably rejected the narrative attempt, and, as the Court will explain in detail below (in the IAC iteration of this claim), counsel reasonably proceeded thereafter. *See Benedict v. Henderson,* 721 F. Supp. 1560, 1563 (N.D.N.Y. 1989) ("Although not so expressed, it is evident that trial counsel had justifiable doubts about the truth of [his client's] position. I think he acted sensibly and preserved the

continuance of the trial and the confidence of petitioner by his careful statements for the record."), *aff'd*, 904 F.2d 34 (2d Cir. 1990).

Finally, the Court notes that Sullivan severely underrepresents the testimonial quantum afforded. Sullivan testified at length. The record includes Sullivan's attempts to establish his framing theory, undermine the Government's motive theory, prove an alibi, and impeach prosecution witnesses' credibility. Post-conviction, Sullivan clearly wishes he had said more. However, his attempts to infuse that regret with constitutional significance, by casting blame on the Court or his counsel, do not warrant relief. Sullivan enjoyed the full opportunity to testify.

## VII.    RIGHT TO COUNSEL (JAILHOUSE INFORMANTS)

Virdell Hicks and Timothy Arnold, jailed with Sullivan pretrial, each testified regarding incriminating Sullivan statements. *See generally* DE 196, at 33–51 (Hicks); DE 197, at 108–59 (Arnold). Sullivan claims Arnold and Hicks, acting as government agents, violated his Sixth Amendment rights by eliciting the statements without his counsel present. As with every preceding claim, Movant's unexcused procedural default forecloses relief here too. *See supra* Part III. Additionally, Sullivan's evidence and conjecture are not sufficient to prove either that the informants were cloaked with governmental authority or that they deliberately elicited his statements. The Court rejects the Sixth Amendment claim.

The right to counsel attaches after formal prosecution commences, and the right applies to all critical stages. *McNeil v. Wisconsin*, 111 S. Ct. 2204, 2207 (1991). A defendant is "denied the [Sixth Amendment's] basic protections . . . when there [is] used against him at his trial evidence of his own incriminating words, which federal agents had

45

deliberately elicited from him after he had been indicted and in the absence of his counsel." *Massiah v. United States*, 84 S. Ct. 1199, 1203 (1964). "The right to counsel applies . . . to indirect and surreptitious interrogations by covert government agents and informants." *Ayers v. Hudson*, 623 F.3d 301, 309 (6th Cir. 2010) (citing *United States v. Henry*, 100 S. Ct. 2183, 2188 (1980)) (internal quotation marks omitted). "[A] Sixth Amendment violation occurs whenever the [government] intentionally creates a situation likely to induce a defendant to make incriminating statements without the assistance of counsel, *Henry*, 447 U.S. at 274, 100 S. Ct. [at 2189], or knowingly exploits a situation in order to obtain incriminating information from a defendant without counsel being present." *Id.* (citing *Maine v. Moulton*, 106 S. Ct. 477, 487 (1985)) (internal quotation marks omitted). A "court must . . . analyze the facts and circumstances of a particular case to determine whether there exists an express or implied agreement between the State and the informant at the time the elicitation took place that supports a finding of agency." *Id.* at 311–12 (internal citations omitted).

A *Massiah* claimant must show more than "that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police." *Kuhlmann v. Wilson*, 106 S. Ct. 2616, 2630 (1986). "Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." *Id.*

The remedy for statements obtained by government agents in violation of the Sixth Amendment is, typically, suppression. *United States v. Ford*, 176 F.3d 376, 380 (6th Cir. 1999). However, evidence otherwise excludable for uncounseled elicitation can be admitted to challenge inconsistent trial testimony. *See Kansas v. Ventris*, 129 S. Ct.

1841, 1846 (2009) ("Our precedents make clear that the game of excluding tainted evidence for impeachment purposes is not worth the candle."). Finally, a *Massiah* violation does not justify vacatur if the tainted evidence's admission "was harmless beyond a reasonable doubt." *Ayers*, 623 F.3d at 317 n.12 (citing *Milton v. Wainwright*, 92 S. Ct. 2174 (1972)).

Sullivan was indicted, and his right to counsel attached, before the relevant period of interaction, which occurred during custody. His claims, nonetheless, fail. Regarding Hicks, Sullivan contends a December 20, 2002, handwritten note proves Agent Warner directed covert Sullivan-questioning after a December 16, 2002, meeting. DE 407, at 15; DE 420-1, at 6 (Hicks Note). Sullivan's deliberate elicitation theory does not square with the record. At trial, Hicks stated that he shared a cell with Sullivan for two or three days in November 2002 while at Boone County Jail, made notes of Sullivan's statements during that period, and was transferred to the Federal Medical Center in Lexington on November 21, 2002. Unsolicited, he notified the United States Marshal that he had information, and only then met with Agent Warner. The note only shows a December 16, 2002, meeting between Warner and Hicks. That meeting does not suggest agency or elicitation during Hicks's conversations with Sullivan nearly a month before. In short, Sullivan offers no proof that his interactions with Hicks were condoned, coordinated, or even contemplated, by law enforcement. Indeed, per Hicks, he met with SA Warner at FMC Lexington. *See* DE 196, at 36. If he met first with Warner at FMC Lexington, then he could not, thereafter, have secured information from Sullivan because his housing with Sullivan occurred prior to the Warner overture. This is a matter of simple jail logistics and historical chronology.

Sullivan's speculative elicitation "proof" regarding Arnold's testimony fares little better. Arnold never shared a cell with Sullivan. After a third-party introduction, Sullivan, to Arnold, described details of his crimes, which Arnold purportedly logged.[26] DE 197, at 111. His initial notes were at US Exhibit 2-1. Arnold, following a meeting with Warner and two Sullivan conversations, noted that he "[t]ried to find out owner of Nissan's name, but he changed the subject." DE 369-1, at 259. Sullivan claims Arnold could only have heard of a Nissan through Agent Warner. DE 420, at 18. This self-serving conclusion ignores the obvious alternative, that Sullivan himself mentioned the vehicle.

In truth, the United States relied only on proof Arnold purportedly gathered in the first encounter between Sullivan and Arnold and in observing Sullivan and his wife. The meeting sequence and Sullivan's spin do not here amount to anything of consequence. It

---

[26] The Court notes that Arnold's testimony regarding the Warner/Sullivan conversation timeline is not fully consistent. Arnold, who admitted being weak on dates, testified (1) that he contacted Warner only after jotting some notes following a Sullivan conversation, (2) that he believed his latest Warner meeting—per Warner's notes—was September 12, 2002, (3) that he wrote the Sullivan-cited notes in August or September of 2002, and (4) that the notes were from Sullivan conversations on September 20th and October 2nd. DE 197, at 112, 139, 141–42, 147. Arnold was placed in custody in February 2002; he met Sullivan around July 2002. *Id.* at 111, 128. On the noted conversation dates, September 20th and October 2nd, Sullivan and Arnold were only incarcerated at the same facility in year 2002. Thus, Arnold either incorrectly recorded the relevant dates or provided Warner the notes after their final September 12, 2002, meeting. Logically, notes from October interactions would not exist in August or September.

Defense counsel highlighted Arnold's propensity for dissembling at trial. DE 197, at 125. The above inconsistencies were also of record. Thus, the jury was free to discredit Arnold's testimony entirely. However, it is not the Court's role, on § 2255 review, to parse witness credibility, and witness incredibility is not directly relevant to Sullivan's counsel denial claim. The Court is aware that Arnold could not have both talked shop with Sullivan on the logged dates and had no prior Warner meeting. What the Court does not see is incriminating proof, secured at Warner's coordination and offered against Sullivan. Based on the testimony, the Arnold proof was either a) from the first encounter with Sullivan, which was prior to the Warner overture, or b) from a mere observance by Arnold of interaction between Sullivan and his wife. The United States offered no proof elicited from Sullivan by Arnold, acting as an agent and tethered to the strings of Warner.

was the defense (Carol Sullivan) that offered Exhibit 7 into the proof, and the Government did not offer proof, via Arnold, on the Nissan issue.

Sullivan failed to prove that Hicks or Arnold either acted as governmental agents or obtained incriminating statements through deliberate elicitation or knowing exploitation. The Hicks-proof is nonexistent, and while the record shows that Arnold is deceptive, Sullivan's interpretation of an innocuous note is not proof of agency, elicitation, or exploitation.

Finally, even if Hicks, Arnold, or both unconstitutionally elicited Sullivan's statements, admission of the uncounseled interrogation fruits was harmless beyond a reasonable doubt. *See Ayers*, 623 F.3d at 317 n.12 ("*Massiah* violations are [ ] subject to harmless-error analysis."). Given the scope and contents of Sullivan's trial testimony—*e.g.*, he denied commission of each robbery—the Hicks- and Arnold-related prior statements could each have been admitted for impeachment purposes. *Ventris*, 129 S. Ct. at 1846 ("Once the defendant testifies in a way that contradicts prior statements, denying the prosecution use of the traditional truth-testing devices of the adversary process . . . is [too] high [a] price to pay for vindication of the right to counsel at the prior stage." (internal citations and quotation marks omitted)). The counsel denial claims thus fail.

## VIII. INEFFECTIVE ASSISTANCE OF COUNSEL (IAC) CLAIMS [27]

Sullivan alleges his trial counsel was ineffective—on twenty-five grounds—and further that two conflicts of interest adversely affected his performance. DE 407, at 10,

---

[27] As to communications necessary to litigate the ineffective assistance claims, Sullivan has waived attorney-client privilege. *See* DE 410 (Order); *In re Lott*, 424 F.3d 446, 453–54 (6th Cir. 2005) (holding that petitioner's assertion of actual innocence effected no waiver of attorney-client privilege, but also finding implied waiver is "the result of a petitioner's assertion of his own counsel's ineffectiveness").

12; DE 407-2, at 1–10.[28] Specifically, Sullivan claims conflicts based on Neff's alleged belief that Sullivan was guilty, and on Neff's purported personal relationship with Agent Warner.

Whatever Neff believed about Sullivan's guilt, the record shows that he thoroughly tested the Government's case. Sullivan offers no proof that any Warner-Neff relationship—itself unsubstantiated—impacted his performance. There was, on this record, no conflict. Neff—facing voluminous proof of Sullivan's guilt—thoughtfully prepared, vigorously advocated, and cleverly strategized. Sullivan's ultimate conviction resulted from his factual guilt, not counsel's deficiency. The Court, under the applicable standards, and for the reasons that follow, rejects each of Sullivan's attacks on Neff's performance.

### A.  *Governing Standards*

#### *Strickland*

A movant claiming ineffective assistance must prove both deficient performance and prejudice. *Strickland v. Washington*, 104 S. Ct. 2052, 2064 (1984); *Campbell v. Bradshaw*, 674 F.3d 578, 586 (6th Cir. 2012); *Pough v. United States*, 442 F.3d 959, 964

---

[28] The Court is bound by the *Massaro* Court's "clear rule allowing [IAC] claims to be brought . . . under 2255[,]" notwithstanding standard procedural default principles. 123 S. Ct. at 1695–96. Further, the Court recognizes that any bright line rule's efficiency benefits almost always accrue at the cost of inefficiencies in outlier cases. However, the uber-developed post-resentencing record here cuts directly against the precepts underlying *Massaro*. *See, e.g.*, 123 S. Ct. at 1694 ("Applying the usual procedural-default rule to ineffective-assistance claims would have the opposite effect, creating the risk that defendants would feel compelled to raise the issue before there has been an opportunity fully to develop the factual predicate for the claim."). Indeed, given the litigation history, the Court could not imagine a case better developed to include IAC on direct appeal, referencing the *Massaro* Court's qualification, *i.e.*, that § 2255 would be the preferable vehicle for deciding IAC claims only in "*most* cases[.]" *Id.* Notwithstanding the post-resentencing record's patent sufficiency, the Court proceeds with merits review based on *Massaro*'s unequivocal rule.

(6th Cir. 2006) (noting that a movant must prove ineffective assistance by a preponderance of the evidence). In order to prove deficient performance, a movant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 104 S. Ct. at 2064. A movant meets this burden by showing "that counsel's representation fell below an objective standard of reasonableness" as measured under "prevailing professional norms" and evaluated "considering all the circumstances." *Id.* at 2064–65. Judicial scrutiny of counsel's performance, however, is "highly deferential," featuring a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Id.* at 2065. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]" *Strickland*, 104 S. Ct. at 2066.

In order to prove prejudice, a movant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 2068. When evaluating prejudice, courts generally must consider the "totality of the evidence before the judge or jury." *Id.* at 2069.

### *Cuyler*

Additionally, a defendant able to show that his lawyer had a rare "actual conflict of interest" need not prove prejudice. *Cuyler v. Sullivan*, 100 S. Ct. 1708, 1719 (1980). In such circumstances, the "conflict itself demonstrate[s] a denial of the right to have the effective assistance of counsel." *Id.* (internal citations and quotation marks omitted). A defendant pursuing a *Cuyler* claim must establish (1) "that his counsel actively

represented conflicting interests" and (2) that the conflict "actually affected the adequacy

of his representation[,]" *i.e.*, deficient performance. *Id.*[29]

### B. Alleged Conflicts

Sullivan argues Neff was conflicted by his belief that Sullivan was guilty.

Sullivan principally relies on Neff's handling of Sullivan's trial testimony, for example:

> [A]fter the Court gave counsel and the Defendant extra time to go over the
> questions, while Defendant was on the stand, counsel just stood there,
> holding these questions, and after a long time standing there holding the
> questions, counsel finally says: "Greg, is there anything else that you
> would like to tell the jury?"
> . . . .
> [After a bench conference] Counsel finally approaches the stand and says:
> "Greg, you have been charged with committing a number of crimes. You
> have been charged with the robbery of 12 separate bank's. Now, you have
> entered a not guilty plea to the indictment, which is an indication that you
> did not do what you were charged with. The first bank you were charged
> with is Columbia Federal, which is December 17th of 1999. Greg, did you
> rob that bank?" Defendant: "No, I did not." Counsel went through all
> twelve Bank's, asking the same as above, and afterwards, counsel walked
> off with no more questions. This all played out in front of the Defendant's
> jury, it was only obvious that when counsel did not ask any type of
> questions other than a fact already known, that being that the Defendant
> was pleading not guilty or he wouldn't be in trial, but the jury had to of
> known counsel thought his client was guilty.

DE 407-2, at 11. Even if Neff believed Sullivan was guilty,[30] he nonetheless faithfully

represented Sullivan's interests. Mere belief in a client's culpability is not an "interest"

that creates a *Cuyler* conflict. *Cf. United States v. Leggett*, 81 F.3d 220, 227 (D.C. Cir.

---

[29] "Similarly, if counsel entirely fails to subject the prosecution's case to meaningful
adversarial testing, then there has been a denial of Sixth Amendment rights that makes
the adversary process itself presumptively unreliable." *United States v. Cronic*, 104 S. Ct.
2039, 2047 (1984). In such circumstances, a separate prejudice inquiry is unnecessary. *Id.*
However, to avoid *Strickland*'s prejudice prong under *Cronic*, "the attorney's failure to
test the prosecutor's case must be complete." *Bell v. Cone*, 122 S. Ct. 1843, 1846 (2002).

[30] The record establishes that Neff believed Sullivan intended to perjure himself.
However, Neff's examination of Sullivan suggests that Neff's perjury concerns likely did
not relate to Sullivan's guilt. Neff directly asked Sullivan whether he committed each
robbery. If he believed Sullivan was guilty, this line of questioning would not have
alleviated Neff's perjury fear.

1996) ("A client's difference of opinion regarding trial strategy hardly indicates that counsel is actively representing conflicting interests. . . . [T]he expected and usual rifts that develop between disappointed defendants and their counsel cannot be characterized as conflicts of interest." (internal citations and quotation marks omitted)).

Sullivan offers utterly no proof that Neff actively represented an interest against him. The prosecution thoroughly fulfilled its role, and Neff adequately discharged his adversarial responsibilities. Judge Coffman rejected Neff's attempt to invoke the narrative form. His subsequent limited questioning[31] was a reasonable attempt to balance competing interests in the trenches of trial:

> In *Strickland*, we recognized counsel's duty of loyalty and his "overarching duty to advocate the defendant's cause." *Ibid.* Plainly, that duty is limited to legitimate, lawful conduct compatible with the very nature of a trial as a search for truth. Although counsel must take all reasonable lawful means to attain the objectives of the client, counsel is precluded from taking steps or in any way assisting the client in presenting false evidence or otherwise violating the law. This principle has consistently been recognized in most unequivocal terms by expositors of the norms of professional conduct since the first Canons of Professional Ethics were adopted by the American Bar Association in 1908.

*Nix v. Whiteside*, 106 S. Ct. 988, 994 (1986). Likewise, Sullivan's speculation that Neff's delay before questioning him signaled guilt to the jury is entirely unfounded. Neff's

---

[31] Sullivan misrepresents the scope of Neff's questioning. *Compare* DE 407-2, at 11–12, *with* DE 199, at 88. Sullivan claims Neff prevented him from presenting his swimming pool employment alibi. DE 407-2, at 14. In fact, Neff's first question allowed Sullivan to explain his line of work. DE 199, at 88. In any event, as discussed in the IAC context below, any specific alibi testimony would have likely been false, and Neff was under no obligation to suborn perjury; his sensitivity to the issue logically and necessarily impacted his advocacy. *See infra* Part VII. E. (proposed alibi witnesses, the Miniards, submitted affidavits rejecting Sullivan's proposed alibi).

53

performance was not deficient. [32] Thus, even if the alleged interest created a potential conflict, it never ripened into an actual conflict. [33]

More than a decade ago, Sullivan, to the Sixth Circuit, argued that the District Court erred in failing to grant his motion to substitute counsel. *Sullivan I*, 431 F.3d at 979–82. The Circuit rejected Sullivan's claim:

> During a hearing . . . on Monday morning, [the first day of trial,] Sullivan unequivocally indicated to the court that he wanted trial counsel to continue to represent him and that everything had been "straightened out."
> . . . .
> To be sure, the record clearly demonstrates "that there was some lack of understanding or lack of confidence" between Sullivan and his lawyer. . . . However, the record does not reveal that the disagreements . . . "resulted in a total lack of communication preventing an adequate defense." . . . The record indicates that Sullivan and his counsel continued to communicate. They conferred regarding Sullivan's decision to testify on his own behalf. While Sullivan was still considering that decision, he directed trial counsel to move for a continuance in order for Sullivan to compose himself to testify and have an opportunity to interview more witnesses.

*Id.* at 981–82. Clearly, Sullivan's displeasure with the circumstances of his trial testimony has not waned over time. However, Neff endeavored to allow Sullivan to present his testimony in narrative form and his disagreement about the questions Neff

---

[32] Sullivan also alleges Neff failed to present several defensive theories to the jury. This is a classic matter of trial strategy. For instance, Sullivan claims he "would've explained to the jury that his son's hat wouldn't possible [sic] fit over his head, it was a fitted hat, of 6 7/8's, and Defendant's size was 7 5/8's" with an accompanying demonstration. DE 407-2, at 13. The Court has little trouble concluding that a 3/4-inch difference in hat size would have made no difference in the verdict. Tim Arnold's pre-Sullivan testimony prefaced the problem of artifice. *See* DE 197, at 112 ("He told me how it [the hat] was small, and he could, if necessary, he could act like it didn't fit."). Further, Sullivan did mention the hat issue in cross. *See* DE 199, at 105 ("Joshua['s] . . . hat wouldn't even fit on my head."). Neff did not fail Sullivan here (and of course, the real hat was, curiously, missing).

[33] Nor would Neff's belief in Sullivan's guilt qualify for the exceedingly narrow *Cronic* criteria. In fact, the Supreme Court has rejected *Cronic* application to counsel's "concession of [a client's] guilt" where the defense "reasonably decide[d] to focus on the trial's penalty phase." *Florida v. Nixon*, 125 S. Ct. 551, 563 (2004). That certainly is not the route of this case.

ultimately asked does not satisfy the high *Cuyler* bar. *See Leggett*, 81 F.3d at 227 ("[W]e are unpersuaded by Leggett's further attempt to style his disagreement with counsel over trial tactics as a 'conflict of interest.'" (internal citation omitted)). A defense lawyer's view of guilt or innocence is an irrelevancy—the measure is effective advocacy under the Sixth Amendment. The Court rejects the conflict claim.[34]

Sullivan also claims Neff had a conflicting personal relationship with Agent Warner. First, Sullivan has no proof,[35] and affidavits from Neff and Warner refute the few direct allegations. DE 412-8 (Neff Aff.). Even if the two had a relationship, Sullivan offers no proof that Neff "actively represented" Warner's interests, or that any association "actually affected" Neff's representation. *Cuyler*, 100 S. Ct. at 1719. Neff's vigorous cross-examinations of Agent Warner, in fact, fatally undermine Sullivan's conflict contention. DE 195, at 118–36; DE 197, at 257–65. Sullivan seems to believe that any level of personal or professional association would be disqualifying. That is not reality, where defense lawyers frequently see agents and prosecutors repeatedly over the course of litigating multiple cases. Collegiality hardly equates to conflict. Neff took dead aim at the Government's case, aggressively seeking suppression, challenging in detail each robbery, and preparedly cross-examining all witnesses, Warner included. There is

---

[34] Because Sullivan fails to connect Neff's alleged belief in guilt to deficient performance, the claim fails under *Strickland* as well. However, the Court notes that Sullivan does not establish prejudice either. Sullivan was able to testify, on cross, to his defensive theory. For instance, Sullivan testified about his child support payments, DE 199, at 95–99, and presented the framing theory. *See* DE 199, at 104 ("So this is all a big conspiracy? A. Yes, it is."). Cross-examination allowed Sullivan to voice most of the subject matter he gripes about here.

[35] The Court does not delve into every specific of Sullivan's extensive factual assertions regarding Warner and Neff's alleged relationship. *See, e.g.,* DE 407-2, at 21 (averring that Neff knew Warner's wife and that Warner gave Neff a ride to the jail for a client meeting). The Court sees nothing of substance.

nothing even mildly suggestive of Neff giving the prosecution (or Warner himself) a pass because of a purported Neff-Warner personal connection.

Sullivan points to no other specific, non-duplicative deficiency arising out of the alleged conflict. Mostly, Sullivan restates his various Warner-related IAC claims in proof-of-conflict terms. As explained below, all of the IAC claims fail, and thus do not substantiate any Neff-Warner conflict. Because Neff's performance was not deficient, the Court rejects the conclusory and speculative conflict assertion.

### C. Reiterated Claims

The Court has already rejected, in alternative form, many of the arguments Sullivan now-couches in ineffective-assistance terms. Having found the underlying bases for these IAC claims untenable, the Court will not readdress them under the *Strickland* rubric. An IAC claim founded on counsel's failure to assert a client's constitutional rights, even if establishing deficient performance, also requires the defendant to prove likely success on the un-pressed claim and a reasonable probability that the hypothetically successful claim would have altered the verdict. *See*, *e.g., Kimmelman v. Morrison*, 106 S. Ct. 2574, 2583 (1986) ("[T]he defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice.").

The Court has found the predicate arguments meritless, and, thus, foreclosed any prejudice finding under *Strickland*. *See Jackson v. Houk*, 687 F.3d 723, 742 (6th Cir. 2012) ("[H]aving already found that the underlying claim of prosecutorial misconduct was not 'adequate to deserve encouragement to proceed further,' *Slack v. McDaniel*, 529

U.S. 473, 483–84 . . . (2000) (internal citations and quotation marks omitted), we cannot

find that defense counsel's failure to object to it constituted ineffective assistance.").

Accordingly, the Court summarily rejects Sullivan's IAC claims based on counsel's

alleged failures to: press the Government, or follow up on co-counsel's tip, for *Brady*

material (Subparts 2, 6, 25);[36] advise of his alleged conflicts of interest (Subparts 8, 9);

follow up on Mary Ann Vowels's pretrial identification (Subpart 4); investigate allegedly

fabricated Heritage Bank evidence (Subparts 16 & 25); unearth Agent Warner's alleged

perjury (Subpart 16 & 25[37]); impeach Warner based on pretrial testimony (Subparts 3, 5,

& 20);[38] subpoena Ft. Wright Officer Michael Knight (Subpart 18);[39] or challenge

---

[36] Sullivan offers no theory that would justify a *Strickland* prejudice finding based on Neff's failure to unearth collectively immaterial *Brady* evidence. *See also* DE 267, at 8 ("Counsel properly requested, and received, all the usual discovery."). Sullivan adds allegations (or relies on different materials)—not previously raised in his *Brady* grounds—in support of him being a suspect before the AFIS match. *See* DE 407-2, at 8 (discussing Warner's interview with Heather A. Tigchelaar before Mary Ann Vowels's alleged lineup identification); DE 420, at 9 (relying on Tigchelaar evidence and arguing "the Defendant was under investigation before the Heritage Bank was robbed"). As discussed, the date Sullivan became a suspect is irrelevant. Movant suggests there is evidence Warner considered Sullivan even earlier than October 2000. Yet, Warner's pre-AFIS suspicions, no matter how early they began, do not impeach his testimony regarding Sullivan's official suspect status. In short, the additional theories do not alter the Court's analysis

[37] Sullivan's sixteenth and twenty-fifth subparts weave together various theories, including multiple repeat claims, in confusing stream-of-consciousness narratives. The Court has sifted through Sullivan's ramblings and attempted to generally classify them in the categories listed above. Nonetheless, portions of the subparts fall outside those bounds and/or overlap with other pre-addressed claims. *See, e.g.*, DE 407-2, at 3 (raising the Heather Tigchelaar claim also raised in the failure to investigate portion of subpart 25). Other subparts are equally repetitive, amorphous, and wandering. Despite *pro se* liberal construction rules, at some point the Court simply cannot solve the inscrutable.

[38] Sullivan generally alleges that Neff failed to investigate Agent Warner's pretrial testimony or impeach him based on such testimony. DE 407, at 10–11 (subparts 3 & 5). He also reiterates the arguments with a specific emphasis on Warner's testimony regarding Sullivan's fingerprints. DE 407-2, at 6 (subpart 20). The record indisputably shows that Neff investigated Warner's pretrial testimony and subsequently utilized the prior statements for impeachment. *See, e.g.*, DE 195, at 124–26, 129 (questioning regarding Warner's grand jury testimony). Sullivan disagrees with the scope of Neff's

fingerprint chain of custody (Subpart 19).[40] Neff was not deficient for failing to act in ways, relative to these theories, that would not have ultimately aided Sullivan. The Court turns to claims not previously addressed in other contexts.

### D. Failure to Investigate Camaro Evidence (Subpart 13)

Defense counsel's failure to "take pictures of the Defendant's wifes [sic] blue Camaro to show it was wrecked on the passenger-side to show that if it was that car the Bank manger [sic] surely would have reported it was wrecked, and also to show that the car was not a z-28, and was not turquoise or aqua-green in color" was not deficient. DE 407-2, at 1. Sullivan's speculation as to the impeaching effect is unfounded. *See* DE 267, at 7 ("For the most part, what Defendant Sullivan wants is for some court to substitute its judgment for the judgment of the jury that found him guilty."). Christopher Caddell, Heritage Bank Vice President, testified that he saw an "aqua-colored Chevy Camaro" leaving the Ramada Inn next door to the bank immediately after the robbery. DE 194, at

---

strategic impeachment choices, but the Court owes such decisions deference. *Strickland*, 104 S. Ct. at 2066 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]"). Further, regarding the specific fingerprint claim, as explained in the *Napue* context, there is no evidence of falsity. Thus, any impeachment would have been fruitless.

[39] The only testimony Sullivan alleges that Wright could have offered relates to the Bait Bill and baseball hat evidence the Court has already rejected as immaterial under *Brady*. *See* DE 407-2, at 5–6. Sullivan claims that this evidence was undisclosed until after trial, but seeks to hold Neff accountable for failing to present evidence that, under Sullivan's own theory, the Government never disclosed. *See Hodgson v. Warren*, 622 F.3d 591, 599 (6th Cir. 2010) (counsel did not perform deficiently by failing to call witnesses with evidence that was only discovered post-trial).

[40] The Court's fingerprint-log *Brady* analysis establishes the futility of the argument Sullivan faults Neff for failing to raise—the time gaps do not establish a reasonable probability of misidentification. *Knowles*, 623 F.3d at 386 ("[I]n order to admit physical evidence, the possibility of misidentification or alteration must be 'eliminated, not absolutely, but as a matter of reasonable probability.' " (internal citation omitted)). Neff extensively questioned Officer Puthoff regarding chain of custody. *See generally* DE 194, at 192–201. Counsel reasonably tested custodial status. He was not obligated to press an unmeritorious exclusion argument.

233. Shown a picture of the Sullivan Camaro, Caddell identified it as the car he saw. *Id.* at 234. The pictures Sullivan believes Neff should have taken would not have made the jury doubt this testimony.

First, evidence of vehicle damage is not inconsistent with Caddell's testimony. Sullivan's conjecture regarding what Caddell might have seen or reported is not proof. Second, the jury was aware of the non-turquoise Camaro coloration. The Government's exhibit-photos captured Sullivan's vehicle. DE 195, at 98 – 99; *see also id.* at 178 (Karen Sullivan testified that Defendant drove a "blue Camaro."). Third, the Government's theory was always that "an aqua Camaro, *similar* to the one" Sullivan's wife drove, "was seen in the area of the bank shortly after the robbery." DE 195, at 112 (emphasis added). Sullivan here offers nothing to show that any damage was so extensive and so pronounced that Caddell certainly would have remarked on it. In the agitation of a post-robbery moment, Caddell saw the bandit run behind the motel and then saw the identified car quickly leave from behind the building. Sullivan does not prove and the Court does not see proof of vehicle blemishes as probative on the identification issue.

### E. *Failure to Inform/Obtain Alibi Witnesses/Obtain Pool Receipts (Subparts 11–12)*

Sullivan decries Neff's failure to inform him that the Sullivan-provided phone number for alleged alibi witnesses (the Miniards) was non-functioning so that he could provide alternative contact information. He also complains that Neff failed to obtain receipts that would substantiate his pool employment. The Court rejects the conclusory, one-sentence, ineffectiveness allegations.

Magistrate Judge Wehrman previously dealt with the former claim:

> The matter of the alleged alibi witnesses is resolved even more readily. According to the affidavit of trial counsel, Defendant Sullivan provided an incorrect spelling and a disconnected telephone number in connection with two witnesses who purportedly provided him with an alibi for one robbery. *See* Doc. 259, attachment p. 2. Defendant Sullivan concedes that he misspelled the last name. Doc. 265, p. 32. In light of the number of robberies with which Defendant Sullivan was charged, counsel's attempts to locate the alleged alibi witnesses cannot be said, even with the benefit of hindsight, to constitute deficient performance. Even if they did, however, Defendant Sullivan cannot show prejudice, as these two witnesses have since provided affidavits to the United States in which they fail to provide Defendant Sullivan an alibi for even that one robbery. Doc. 205.

DE 267, at 9–10. Sullivan offers no basis to depart from Judge Wehrman's treatment, and the Court rejects the claim for the same factual and legal reasons.

Co-Defendant's counsel highlighted the existence of pool chemical receipts for the jury, and Neff was not obligated to elicit duplicative testimony. DE 195, at 145. Testimony—from Defendant, DE 199, at 88, his ex-wife, DE 195, at 177, and his son, DE 198, at 82—additionally described Sullivan's aquatic employment. The jury rejected the defensive theory. Sullivan, now, baldly claims the receipts themselves would have helped support an alibi for the Heritage Bank robbery. He offers no proof. Neff "properly requested, and received, all the usual discovery[,]" DE 267, at 8, and the record shows that the prosecution provided the receipts for counsel's review. DE 195, at 168. Neff reasonably investigated the receipts; Sullivan presents nothing indicating otherwise. The virtually unchallengeable status of Neff's strategic decision not to use the particular receipts is, on this record, undisturbed.

### F.  Key Witness Impeachment (Subpart 24)

Sullivan argues that Neff should have impeached key witnesses Deborah Kenton and Clyde Collett. Deborah Kenton, a teller at Columbia Federal during both the 1999

and 2000 robberies, testified that she believed the same person robbed her bank twice, based on matching voices, identical "long and slender" hands, a repeat request for a bag, and her perception that the robber "knew our branch." DE 196, at 260, 267–69. Kenton proceeded to identify Sullivan as the culprit. *Id.* at 270. Neff, on cross, thoroughly questioned Kenton about the witness identification form she completed after the robbery. *Id.* at 276–82. Sullivan contends Kenton's handwritten statement that she "told him [she] had to go to [her] drawer" impeaches her claim to matching robber identity based on bank familiarity, and that Neff's failure to utilize the statement was deficient. DE 407-2 at 7. The Court disagrees.

Sullivan's impeachment premise involves a confusing logical leap. He identifies no context for Kenton's written statement. Kenton telling the robber that she had to go to her drawer is not inherently inconsistent with the robber having bank familiarity. As noted above, and contrary to Sullivan's implication, bank familiarity was only one basis for Kenton's repeat-robber belief. Moreover, Patricia Foley, the Branch Manager, was also present for both Columbia Federal robberies, and gave consistent descriptions of the sole perpetrator. *See* DE 196, at 245, 247. Neff's cross-examination of Kenton was reasonable, and his failure to invoke Sullivan's tenuous impeachment theory was hardly deficient.

Sullivan also bemoans Neff's failure to impeach Clyde Collett—a bystander outside Park Federal Credit Union following the December 6, 2001, robbery. DE 407-2, at 7–8. At trial, Collett testified that he saw a man—he subsequently identified as Sullivan—"coming out of the credit union door." DE 196, at 191, 193. Sullivan claims Neff should have used an FBI 302 report (authored by Agent Warner) for impeachment

because it reported Collett seeing the robber "coming from the area of the Bank[.]" DE 407-2, at 7. The two statements are not inconsistent. Neff reasonably declined to question Collett about this non-discrepancy.

Sullivan, again relying on Warner's 302, argues Neff should have impeached Collett's in-court identification based on the witness's previously reported inability to get a clear view of the person leaving the bank because a coat covered the person's head. DE 407-2, at 7–8. This information was fully before the jury. DE 196, at 224 ("Do you remember back in December of 2001 telling Agent Warner that the person that you saw coming out of the credit union had his coat over his head? A. Yes."). Neff was not deficient for failing to elicit duplicative testimony. The lawyers for both Defendants put Collett through a complete adversarial testing.

### G. Continuance (Subpart 1)

Sullivan claims Neff was ineffective for failing to seek a continuance, to allow additional trial preparation. However, "[t]he record reveals that trial counsel was prepared and informed throughout the proceedings." DE 267, at 13. Sullivan does not prove (or really, even explain) how a continuance would have been helpful. "Because additional time would not necessarily have aided [Sullivan]'s defense, the Court cannot say that his counsel's failure to seek a continuance fell below an objective standard of reasonableness such to constitute deficient performance." *Johnson v. Bell*, 525 F.3d 466, 488 (6th Cir. 2008) (internal citation omitted).

### H. Eyewitness Expert Prep (Subpart 10)

Sullivan claims that Neff failed to adequately prepare Defendant's eyewitness expert, Dr. Solomon Fulero. Specifically, Sullivan claims Neff failed to provide Dr.

Fulero testimony from the eyewitness suppression hearing and two of the Government's photo arrays. DE 407-2, at 1. The record establishes that Neff actually provided the expert significant documentation. DE 199, at 15 ("I have reviewed various Court-related documents, documents that have information about witnesses, and eyewitness identification procedures, transcripts of matters in this case."). Even assuming Neff actually failed to give Dr. Fulero the specific referenced information, Sullivan does not explain how the records would have altered the testimony or, ultimately, aided his case. Fulero thoroughly described numerous problems with and foibles of eyewitness identification. His testimony was undoubtedly beneficial to Sullivan. At most, arming Fulero with more examples from the case would have given him the chance to repeat or restate opinions he had already given. Sullivan does not coordinate his arguments with any specific missing testimony from Fulero that would have made a difference. Neff had the expert well-prepared, and the expert gave extensive testimony about the limits of identification reliability. The jury knew the procedures used and heard the identification history of the witnesses. *See United States v. Kane*, 944 F.2d 1406, 1414 (7th Cir. 1991) (rejecting failure to prepare witness IAC claim where there was "no indication that better preparation by [defense counsel] would have changed what transpired."). Sullivan shows neither deficiency nor prejudice; the argument is meritless.

### I.   *Objection/Inspection/Instruction re: PowerPoint (Subparts 14-15)*

Sullivan decries Neff's alleged failure to object to the Government's use of a PowerPoint presentation during opening statements, and claims Neff should have requested an instruction "that the PowerPoint was not to be considered as evidence." DE 407-2, at 2 First, Sullivan does not identify any proper basis for the proposed objection.

The PowerPoint was an argument aid, nothing more. Second, Neff objected to the PowerPoint being entered into evidence. DE 198, at 117. Third, Judge Coffman effectively instructed on the evidence proper for jury consideration. DE 200, at 106 ("The evidence in this case includes only what the witnesses said while they were testifying under oath; the exhibits that I allowed into evidence; the stipulations or agreements between the lawyers; and the facts that I have judicially noticed. Nothing else is evidence. The lawyers' statements and arguments are not evidence."). Sullivan's PowerPoint challenge fails.

### J. *Fingerprint Technician (Subpart 17)*

Sullivan contends Neff should have subpoenaed Dawn M. Bayless, the Covington Crime Lab technician, to question her regarding a number of fingerprinting issues. The Court will not analyze the proposed questions concerning undisclosed evidence; that is ground already covered in the *Brady* context. *See* DE 407-2, at 5 ("[U]ndisclosed palm print . . . would[ ] . . . impeach Agent Warner's testimony that there were no other fingerprints[.]"); *see also Hodgson*, 622 F.3d at 599 (counsel did not perform deficiently by failing to call witnesses with evidence that was only discovered post-trial). The remaining questions Sullivan believes Bayless should have been called to answer generally concern print match validity. *See* DE 407-2, at 5. Bayless's own affidavit establishes the futility of Sullivan's advocated line of questioning. *See generally* DE 412-7 (Bayless Aff.). Neff thoroughly investigated the viability of a strategy attacking the fingerprint evidence:

> The final alleged deficiency on the part of trial counsel is the failure to call a fingerprint expert at trial. According to trial counsel's affidavit, he did hire and consult with such an expert, who analyzed the fingerprint evidence in this case but learned no

> "information or evidence that would . . . assist counsel in presenting a defense for Gregory Sullivan." Doc. 259, Attachment p. 3, ¶¶ 14-16. The decision not to call the expert is trial strategy, which a reviewing court is required to afford great deference, according to the Supreme Court in *Strickland*. 466 U.S. at 691. The failure to call an expert whose testimony is not going to benefit the client cannot be said to be deficient performance.

DE 267, at 11–12. Neff's failure to call a fingerprint technician within the evidence chain was not deficient performance.

### K. Prior Bad Acts Testimony (Subparts 21 & 23)

Before trial, Neff successfully moved to exclude evidence of Sullivan's prior convictions and other prior bad acts. DE 194, at 21–22. Sullivan claims Neff ineffectively induced Agent Warner and Officer Puthoff to testify that Sullivan photos used in lineups came "from Defendant's prior arrest, although they were only alcohol related but the jury did not know and did not need to know Defendant was ever arrested before[.]" DE 407-2, at 6. The Court finds no ineffectiveness on this basis.

Warner never testified that the photos came from Defendant's prior arrest. Warner did generally state that the photos he used to put together the lineup came from the Boone County Jail, but he did not particularly reference Sullivan in this statement. *See* DE 195, at 123. Officer Puthoff testified that a jail arrest photo was the source of an image used in the spread:

> Q [Neff].  So . . . when you were putting together that photo lineup, you wanted the photos on that page in that lineup to look as similar as possible to the description you were given?
>
> A [Puthoff].  To one another and to the description that we had, yes.
>
> Q.  Now, when you were putting that together, did you have a photograph of Mr. Sullivan?
>
> A.  Yes, I did.

Q.  Okay.  Where did you get that photograph?

A.  It is a jail arrest photo.

Q.  Okay.  And you were matching your -- your filler pictures, the pictures that you got out of your data bank to that picture of Mr. Sullivan?

A.  Yes.

DE 194, at 212. Certainly, this did suggest an arrest of Movant, but Sullivan makes much of very little. This answer came in as part of a reasonable strategic effort to discredit the various photo-array identifications. In concert with an eyewitness expert who described the biasing effects of multiple and/or improper identification procedures, Neff sought to discredit the Fort Wright eyewitness identification obtained by Puthoff. With the benefit of hindsight, it is easy to say that this strategy could have been carried out without the complained of question. *Strickland* bars such second guessing. *See also United States v. Dado*, 759 F.3d 550, 567 (6th Cir. 2014) ("In assessing deficient performance, we 'must take care to avoid 'second-guessing' strategic decisions that failed to bear fruit.' " (internal citations omitted)). Neff's Puthoff-examination was not deficient.

Further, the timing of the array compilation is unclear. The jury well-knew that Sullivan had prior interaction with Agent Warner, from back in 2000. It also knew that authorities had identified Sullivan as to the fingerprint match. If, as is likely the case, Puthoff formulated the array after law enforcement had identified Sullivan, the fact of a jail arrest photo would have been no news at all to the jury. Sullivan casts the response as monumentally prejudicial, but the statement carries no such weight. The jury was aware Sullivan had been arrested at least once—for the bank robberies. The jury might well have believed the photo came from the federal arrest. In fact, had Neff employed the

66

qualification Sullivan proposes ("they were only alcohol related") the existence of prior legal problems would have been clear.

In any event, Sullivan does not explain how this isolated comment, during a seven-day trial, prejudiced him. He does not claim the jury convicted him of robbing a dozen banks because they knew his mugshot was taken at an unknown time, after being arrested for an unknown crime, after which he may or may not have been convicted. The photo-source question was not ineffective assistance.

Neff's stipulation to introduction of two Sullivan mugshots was also reasonable. Sullivan contends the photos conveyed a prior arrest. He does not explain. Nor does he identify any basis Neff could have relied on to have the mugshots excluded in this case where Sullivan's image was a central topic. *Morva v. Zook*, 821 F.3d 517, 533 (4th Cir. 2016) ("It is not objectively unreasonable for counsel to stipulate to a fact that the government can prove."), *cert. denied*, 137 S. Ct. 1068 (2017). Neff "may have also made a tactical choice [to stipulate] . . . to avoid drawing further attention to the fact that the pictures were mug shots." *Robins v. Fortner*, 698 F.3d 317, 338 (6th Cir. 2012). The Court rejects the conclusory allegation.

### L.  *Child Support Motive (Subpart 22)*

Sullivan argues Neff deficiently failed "to object to the government's theory that Defendant had Motive to rob Bank's [sic] because he was behind on child support[.]" DE 407-2, at 6. Per Sullivan, Neff should have objected to this theory because it showed prior bad acts or wrongs and because Sullivan was not yet behind on child support during the earlier robberies. *Id.* at 7. Yet, Federal Rule of Evidence 404(b) explicitly permits admission of prior bad acts for the purpose of "proving motive[.]" Fed. R. Evid.

404(b)(2). Sullivan's other claims go to the motive evidence's weight, not its admissibility. Neff's failure to raise foredoomed objections was not unreasonable. Nor does Sullivan show prejudice. Sullivan's own testimony directly attacked the same evidence he claims Neff should have challenged. DE 199, at 99 ("By God, if I was robbing these banks like I've been accused, I damn sure would have that [child support] money there."). Child support status was a theme throughout. Some of the evidence dramatically hurt Sullivan (*e.g.*, substantial cash payment on the date of a robbery). But Sullivan also offered proof, via his ex-wife, that he had a zero balance. DE 197, at 280. Neff did what he could with a difficult area in the case, and the Court rejects Sullivan's second-guessing. The jury considered and ultimately rejected his defense. The Court, in the § 2255 context, follows suit.

### M. Failure to Move for Acquittal (Subpart 7)

Sullivan contends Neff should have moved for acquittal based on the Government's alleged failure to establish a proper foundation for government-insured status as to nine of the ten robbed institutions—excluding only First Security Bank. *See* DE 407, at 11; DE 407-2, at 1. Proof of FDIC or NCUA insurance here was sufficient— though such is not always[41] required—to establish that an institutional victim is a "bank" or "credit union" for purposes of 18 U.S.C. § 2113. Qualifying "bank" status is a necessary predicate for a valid federal bank robbery conviction. *See United States v. Wood*, 780 F.2d 555, 556 (6th Cir. 1986) ("One of the elements of the offense defined by

---

[41] In relevant part, section 2113 defines "bank" to include "any institution the deposits of which are insured by the Federal Deposit Insurance Corporation" and "credit union" to include "any Federal credit union and any State-chartered credit union the accounts of which are insured by the National Credit Union Administration Board[.]" 18 U.S.C. § 2113. Other theories could include being a Federal Reserve Bank or a federally organized bank. *See United States v. Sandles*, 489 F.3d 508, at 513 n.2 (6th Cir. 2006). The Government here pursued only the insured status route.

18 U.S.C. § 2113, with which defendant was charged, is that the deposits of the financial institution robbed must have been insured by the FDIC at the time of the robbery. 18 U.S.C. § 2113(f).")

The United States in fact presented proof of insured status for each bank and credit union. *See* DE 194, at 223 (Heritage Bank - FDIC); DE 195, at 217–18 (Firstar Bank - FDIC); DE 196, at 139–40 (Provident Bank – FDIC), 142–44 (PNC Union, Taylor Mill, & Edgewood – FDIC), 152–53 (Park Federal Credit Union – NCUA), and 239–40 (Columbia Savings Bank – FDIC); DE 197, at 60–61 (C & O Credit Union – NCUA). The FDIC/NCUA evidence was sufficient. *See, e.g.*, *United States v. Harris*, 165 F.3d 1062, 1066 (6th Cir. 1999) ("[B]anking officer . . . testified that the bank was insured by the Federal Deposit Insurance Corporation at the time of the offense. . . . Nothing more was required.").

Notably, Neff did move for a judgment of acquittal under Fed. R. Crim. P. 29, and the Court denied it. DE 197, at 267–68. To the extent Sullivan's deficiency allegation rests on Neff's failure to argue the specific insured-status issue, the Court, on this clear record, finds Neff reasonably declined to add a meritless argument for dismissal.

### N.  Summary

The Court has reviewed the full case history and methodically scrutinized the trial transcript. At all stages, Neff prepared thoroughly, performed worthily, and reacted fastidiously. Neff moved (1) to suppress eyewitness identifications, DE 17, (2) to exclude fingerprint evidence and testimony, DE 22, (3) to admit eyewitness expert testimony, DE 69, (4) to exclude evidence of Sullivan's prior bad acts, DE 194, at 21–22, (5) for a judgment of acquittal, DE 197, at 267, (6) for a *Youngblood* instruction, DE 198, at 102–

03, and (7) to exclude evidence of a defense expert's prior conviction, DE 199, at 2–3. He consulted with fingerprint and eyewitness experts, objected to Government motions to limit Warner questioning, thoroughly cross examined Government witnesses, and highlighted alleged systemic issues with and academic suspicion of eyewitness identifications (a central pillar of the Government's case). [Neff accomplished Much of this while facing Sullivan's repeated efforts to fire him.] Neff sought to widen what minimal cracks there were in the Government's case. That he was ultimately unsuccessful, on this record, hardly suggests his performance fell outside the bounds of prevailing professional norms. The Court's view fully comports with Judge Wehrman's apt prior summary of Neff's efforts: "[U]pon careful review of the records and files on behalf of this *pro se* individual, the undersigned could find no instance of deficient performance." DE 267, at 13–14.

## IX.    EVIDENTIARY HEARING

Sullivan requests an evidentiary hearing. The Court must hold one unless "the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). Further, no hearing is necessary "where the petitioner's allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *Huff v. United States*, 734 F.3d 600, 607 (6th Cir. 2013) (quoting *Arredondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999)) (internal quotation marks removed). Sullivan's claims do not warrant a hearing; the § 2255 motion filings and extensive record in the case show, for the reasons stated above, that all claims fail. There are no contested factual issues that, in the context of

these claims, justify a hearing. The lengthy record, which needs no further development, fully delineates the merits of each claim, and forecloses relief.

## X.    CERTIFICATE OF APPEALABILITY

A Certificate of Appealability may issue where a movant has made a "substantial showing of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(2). This standard requires a movant to demonstrate that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 120 S. Ct. 1595, 1604 (2000); *see also Miller-El v. Cockrell*, 123 S. Ct. 1029, 1039–40 (2003) (discussing development of standard). The reviewing court must indicate which specific issues satisfy the "substantial showing" requirement. *See* 28 U.S.C. § 2253(c)(3); *Bradley v. Birkett*, 156 F. App'x 771, 774 (6th Cir. 2005) (noting requirement of "individualized assessment of . . . claims") (citing *Porterfield v. Bell*, 258 F.3d 484, 487 (6th Cir. 2001)). For dismissal on procedural grounds, as to when a Certificate of Appealability should issue, the movant must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 120 S. Ct. at 1604. Movant has not made a "substantial showing" as to any claimed denial of rights; per the above analysis, all of Sullivan's claims conclusively fail. Reasonable jurists would not find the Court's determinations debatable. Accordingly, the Court recommends that the District Court entirely deny a Certificate of Appealability.

## XI.    CONCLUSION

Sullivan's § 2255 motion warrants no relief. The rejection bases abound. Many claims were defaulted. Others stand totally unsupported by the official record, as the

many pages in this decision depict.[42] Ultimately, all of the claims, on this record and under the relevant standards, fail.

Accordingly, for the reasons discussed above, the Court **RECOMMENDS** that the District Judge wholly **DENY** § 2255 relief (DE 356) and issue **NO** Certificate of Appealability.[43]

\* \* \* \* \*

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights and mechanics concerning this Recommended Disposition, issued under sub-section (B) of the statute. *See also* Rule 8(b), Rules Governing Section 2255 Proceedings for the United States District Courts. Within fourteen days after being served with a copy of this decision, any party may serve and file specific written objections to any or all findings or recommendations for determination, *de novo*, by the District Court. Failure to make a timely objection consistent with the statute and rule may, and usually does, result in waiver of further appeal to or review by the District Court and Court of Appeals. *See Thomas v. Arn*, 106 S. Ct. 466, 475 (1985); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981).

Given the briefing difficulties that follow Sullivan, the Court further refers him to the extensive discussions, in his prior appeals, of the objection requirements relative to a Magistrate Judge's recommendation. Further, and owing to the litigation history, the Court limits Sullivan to 40 total pages in any objection filed.

---

[42] As explained previously, Sullivan, working under a known page limit, chose claim numerosity at the expense of legal discussion and/or supporting documentation.
[43] To ensure a clear and complete record, the Court **ORDERS** the Clerk to file pages 20, 35, and 38–40 of DE 395-2, already attached to a denied motion and in the Clerk's papers, in the official case record.

This the 30th day of March, 2018.



**Signed By:**

_**Robert E. Wier**_

**United States Magistrate Judge**